**CHARBONNAGES DE FRANCE,
Appellant,**

v.

**Frank B. SMITH, Juanita Smith, Frank Smith, Jr., Smith Brothers Construction Company and Continental Coal Sales Corporation, Appellees.**

No. 77–2205.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 4, 1978.

Decided May 3, 1979.

408

Roger W. Tompkins, Charleston, W. Va. (Bowles, McDavid, Graff & Love, Charleston, W. Va., Edward R. Leydon, Bernstein & McCarthy, New York City, on brief), for appellant.

Robert H. C. Kay (George S. Sharp, Kay, Casto & Chaney, Charleston, W. Va., on brief), for Frank B. Smith, Juanita Smith and Frank Smith, Jr.

John A. Neatherton, Xenia, Ohio (Rudolph L. DiTrapano, Charleston, W. Va., on brief), for Smith Brothers Const. Co. and Continental Coal Sales Corp.

Before BRYAN, Senior Circuit Judge, and WIDENER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge:

Plaintiff appeals from the grant of summary judgment in favor of three individual and two corporate defendants against whom it had brought a diversity action alleging breach of contract and tortious interference with contractual relationships. The district court concluded as a matter of law that on certain undisputed facts before it on the defendants' motions for summary judgment no contract had come into existence between the alleged contracting parties so that there had been no breach and no tortious interference. Because summary judgment was not proper on the record before the district court, we reverse and remand for further proceedings.

I.

The salient facts, as drawn from the record upon which the district court granted summary judgment,[1] may be summarized as follows.

During early 1974, the plaintiff Charbonnages de France[2] (Charbonnages) was looking for sources of coal in the United States with which to supply its French customers. At that time the individual defendants Smith owned all the stock in the defendant Smith Brothers Construction Company (Smith Brothers), which in turn owned valuable coal leases in Mingo County, West Virginia. The individual Smiths also owned mining equipment that was leased to Smith Brothers. In an attempt to bring the Smith interests together with Charbonnages, a group of six individuals formed the Apex Mining Corporation (Apex) in June of 1974.

---

**1.** The facts summarized are largely undisputed on the summary judgment materials. However, reflecting our stance in appellate review, see Part III *infra,* they are drawn to give the plaintiff that most favorable reading to which it is entitled in opposing summary judgment. This being the source of the facts summarized, our recitation intimates no opinion as to whether they are the actual facts of the case; that remains for proof.

Although our analysis concentrates essentially on the culminating events in these parties' extended negotiations, the whole course is summarized because of its relevance in showing the existence of those genuine issues of material facts that requires reversal. The relevance will be apparent from our discussion.

**2.** A corporate entity created by decree of the French Government. Governed by an Executive Committee comparable to a corporate board of directors, it possessed independent legal status and financial autonomy, with full capacity to acquire property of all kinds, but required formal government approval to invest funds outside of France. This latter condition is of importance in the case, and its significance is discussed in detail in Part II of the opinion.

Representatives of Apex put Charbonnages in contact with defendant Frank B. Smith (Smith) who in all of the ensuing negotiations between the various parties acted as fully authorized agent of the Smith interests. Acting on information supplied it about the Smith mine reserves and the characteristics of the coal available from the Smith Brothers mine and based upon its testing of a sample of the coal, Charbonnages became definitely interested and sent a mining engineer to West Virginia for an on-site inspection. Favorably impressed, Charbonnages then entered into discussions with Apex and Smith looking to the possibility of a long-term arrangement for its purchase of coal from this property. In all the ensuing negotiations, Charbonnages was represented by the New York law firm of Bernstein & McCarthy, with each of the named partners directly involved from time to time. Negotiations and discussions during April and May of 1974 led to a proposed three-way arrangement in which Charbonnages would make a loan of four million dollars to Apex, which Apex would use to purchase all of the outstanding stock of Smith Brothers plus the mining equipment owned by the Smiths individually. Smith would stay in the picture by continuing to operate the mine under a separate agreement with Apex, and in consideration for its loan Charbonnages would be guaranteed by Apex a supply of coal at a preferential price over a five-year period during which Apex would repay the four million dollar loan with its revenues from the coal sales.

By May 16, 1974 these negotiations had reached the point that Charbonnages, Apex and Smith signed a letter of intent, dated that day, which summarized the arrangement above described and indicated the intention of the parties promptly to draw up formal documents memorializing the arrangement. One paragraph of the letter of intent stated Frank Smith's agreement not to negotiate with any outside group concerning the letter's subject during the period of formalizing the projected agreement. Between May 16 and May 30, 1974 the details of the proposed agreement were extensively discussed and negotiated by Charbonnages' attorney McCarthy, Apex's attorney Katz, Smith's attorney Johnson, and Smith's accountant Stevens. On May 31, 1974 the terms and conditions now incorporated in draft documents were reviewed in a meeting attended by various members of the Apex group, their lawyer Katz and one of their accountants. Following this review, Charbonnages' attorney McCarthy was contacted and told that the basic terms of the documents were acceptable from the Apex and Smith standpoints and that since only one or two final details needed to be worked out, McCarthy should take steps to arrange an early closing date with Charbonnages. McCarthy then went to Paris and between June 4 and June 7, 1974 reviewed the draft documents with Charbonnages. Following these discussions, Charbonnages took steps to make the proposed purchase price of four million dollars available for drawing down by Apex, and the draft documents were redrawn and dated June 16, 1974.

Then followed a meeting on June 17, 1974 in Pikeville, Kentucky, between McCarthy representing Charbonnages, Stevens the Smith accountant, and a representative of the Apex group, to review the transaction as now outlined in the draft documents. At the end of this meeting the persons in attendance were in essential agreement on the terms and conditions outlined in the June 16 drafts except for a major question concerning reimbursement by Apex to Smith of approximately $350,000 of the latter's tax liability for 1974. On June 18, 1974 Apex came up with a proposal to Smith for handling this problem and Smith came to New York on June 20, 1974 to discuss this. Following Smith's approval of the proposed solution, Smith and representatives of the Apex group went on the afternoon of June 20, 1974 to the New York offices of Charbonnages' attorneys and there reviewed with McCarthy the solution of the tax question and indicated that with this resolved the parties were in agreement on a proposal now embodied in documents totaling sixty-nine pages. It was then agreed that there should be a formal closing

in Paris during early July, and McCarthy again flew to Paris to meet with representatives of Charbonnages. There, on June 21, 1974, he indicated to Charbonnages that agreement had been reached by the American parties on all points as memorialized in the documents prepared to reflect the negotiations through the meeting of June 20, 1974, whereupon a closing date was set for July 12, 1974 at Charbonnages' office in Paris.

Prior to the scheduled closing date, Smith let it be known to Apex and to Charbonnages' attorneys that he was not happy with various elements of the proposal and that he might not go through with the closing. Thereupon the July 12, 1974 closing was postponed. McCarthy having remained in France, Charbonnages instructed Bernstein, McCarthy's law partner, to attempt to salvage the agreement, and if necessary, to renegotiate it. Bernstein then telephoned Smith on July 12, 1974 and suggested that they meet to discuss the matter. When Smith agreed, Bernstein went to West Virginia where on July 15, 1974, accompanied by a member of the Apex group, he met with Smith at the Smith Brothers mine site. At this meeting Smith specifically identified various elements in the proposed three-way agreement that were not satisfactory to him. Among these was his dislike for use of New York banks to handle the escrow arrangements. He stated a preference for using his local bank in Pikeville, Kentucky. It was also learned at this meeting that, unknown to Charbonnages and Apex, Smith had, during the course of negotiations, removed approximately one million dollars in operating capital from Smith Brothers, although he wanted the purchase price of four million dollars to remain unchanged in the further negotiations. Smith then indicated that he would be willing to make a direct deal with Charbonnages if an arrangement could be made for Apex to step aside and the subsidiary agreements involved in the three-way arrangement eliminated or simplified. Acting on instructions from Charbonnages, Bernstein then indicated that Charbonnages would be willing to renegotiate the agreement and pay the purchase price of four million dollars directly to the Smith interests if that price could be justified in view of the diminution in working capital. To meet this problem Smith indicated in ensuing discussions that he would add to the equipment originally included in the three-way arrangement some additional equipment that he had personally purchased, and he represented that this would permit the opening of a second mine at considerably less cost than contemplated under the proposed arrangement in which Apex was involved. On this basis, discussion then turned to a price of four million dollars for all the shares of Smith Brothers plus the equipment so supplemented, with one million dollars to be placed in escrow with the Citizens Bank of Pikeville to assure compliance with the warranties under the agreement. A member of the Apex group present during these discussions indicated that the Apex group would work out its own arrangement with Charbonnages and go along with the renegotiated straight purchase and sale agreement. At this point Smith and Bernstein shook hands on the new proposal and Smith asked Bernstein to meet him the next day and to draw up the formal papers with Smith's attorney, Johnson, and his accountant, Stevens.

The following day, July 16, 1974, Bernstein met with Stevens and Smith in Pikeville, Kentucky and Smith brought in Ridenaur, of Smith's bank, to discuss the escrow arrangement. After an escrow agreement had been prepared from the earlier Apex agreement text, Ridenaur called in Smith's attorney, Johnson, who was also attorney for the bank. Johnson reviewed the escrow agreement for the bank and found it acceptable. At this time Bernstein showed Ridenaur and Smith a letter from a New York bank certifying that Charbonnages had the sum of four million dollars available for immediate use in the transaction. Bernstein and Johnson then met in Johnson's office on July 16 to write up a purchase and sale agreement reflecting the proposal settled upon by Smith and Bernstein the previous day. Smith was also

present for part of the meeting on July 16 but had to leave because of illness in his family. Bernstein and Johnson remained at work on July 16 and July 17, 1974 preparing a proposed new agreement for use in the direct sale from the Smith interests to Charbonnages.

Because the last meeting of Charbonnages' Executive Committee during the summer was to take place on Friday, July 19, 1974, and Bernstein did not have power to accept the new proposal on behalf of Charbonnages, it became necessary to act on something less than the full draft proposal on which work was proceeding. Accordingly, on July 17, 1974, Bernstein prepared the text of a cable to be sent to Charbonnages setting out the essential terms of the new proposal for a direct sale from the Smith interests to Charbonnages that had been worked out between Smith and Bernstein on July 15, 1974. Bernstein discussed the draft with Johnson who was in agreement with it except for a reference in it to the Apex group. Because of the time constraints, Bernstein and a representative from the Apex group hand carried the proposed cable to Smith on July 18, 1974 at the site of a home Smith was building in Williamson, West Virginia. There Smith and his accountant, Stevens, reviewed the text of the cable. Smith insisted on several modifications to the text. He deleted a reference to Apex. In a provision dealing with sales of coal prior to formal closing he changed "at market price" to "at a price to be agreed." Finally, he insisted that there should be a cut-off date for Charbonnages to respond to the proposal and by agreement a date of July 25, 1974 was inserted in the text of the cable. Smith then signed Bernstein's original draft of the cable as modified at his direction and retained a carbon copy. Bernstein stated that he would send the cable as revised to Charbonnages for the meeting of its Executive Committee the next day and added that he thought Charbonnages would appreciate receiving a cable directly from Smith because there had been no previous exchange between the principals. Smith stated his intention to have his attorney examine the cable message and then to send it directly to Charbonnages. The text of the proposed cablegram, as revised at Smith's direction read as follows, with the matter deleted from Bernstein's original draft marked through and the added matter underscored:

> We confirm ~~method has been arrived at for dealing with Apex group and~~ that we shall sell you Smith Brothers Construction Company with its mining leases representing approximately three million tons, equipment and assets representing approximately one million three hundred thousand dollar cost plus operating capital for four million dollars of which one million will be held in escrow by the Citizens Bank of Pikeville. Until formal closing you would have right to purchase from us ~~at market~~ all coal mined. _at price to be agreed_—
> _Please answer by July 25_—
> Frank Smith
> (signed) Frank B. Smith

Smith never sent a cable, but Bernstein flew back to New York and on the evening of July 18, 1974 cabled the revised text with the added words that it was "the text of the telegram that Mr. Frank Smith is to send to you and of which we have in our possession a signed copy." The following day, July 19, 1974, Bernstein spoke by telephone to Charbonnages' financial director in France, who advised that Smith's proposal had been accepted by Charbonnages' Executive Committee. On the following Monday, July 22, 1974 Bernstein called Smith and told him that his proposal had been favorably acted upon, following this up on July 24, 1974 with a confirming mailgram of which a copy was sent to Smith's attorney, Johnson. The mailgram in its substantive parts read as follows:

> This is to confirm my telephone call of July 22 informing you that your proposal of July 18 to Charbonnages de France had been acted on favorably and that I had been authorized to proceed with the preparation of the contracts pending formal government approval. As we agreed it is important to understand that if for any reason matters cannot be concluded

as we have discussed the terms of the letter of intent of May 16 would have to be respected by all parties.[3]

The reference to "formal government approval" in the mailgram reflected the fact, known to all parties throughout the negotiations, that the French Government by its Ministries of Industry and Finance had to give formal approval for Charbonnages to invest funds outside France.

When Bernstein called Smith on July 22, 1974 to report acceptance by Charbonnages, Smith gave no indication that he did not intend to proceed in accordance with the proposal as accepted. Neither did Smith make any response to the confirming mailgram of July 24, 1974, either to Bernstein or to Charbonnages. On July 29, 1974 Bernstein telephoned Smith's attorney, Johnson, to discuss arrangements for completing the documentation of the agreement. Johnson did not indicate at that time that there was any question about proceeding, but instead indicated that because Smith's accountant, Stevens, was out of town, it would be better to wait until later in the week to make the arrangements. When Bernstein, however, called Stevens on August 2, 1974 to set up a meeting, he was informed for the first time that Smith had "changed his mind" and did not want to sell the mine. Bernstein called Smith by telephone three days later on August 5, 1974 and Smith confirmed that he had changed his mind and did not intend to go through with the sale. Bernstein immediately sent Smith a mailgram which advised him that Charbonnages intended to enforce its rights.

As it developed, on the same day that Bernstein was first notified of Smith's "change of mind," Smith signed an option agreement to sell the subject properties to the defendant, Continental Coal Sales Corporation (Continental) at a better price. Within a few days after the approval of the agreement by Charbonnages' Executive Committee, the French Government agencies gave their formal approval to the transaction, but this formal act by the French Government was not communicated to Smith because, as Bernstein put it, Smith had by then reneged on the deal. On August 7, 1974 Bernstein formally advised both Continental and Smith of Charbonnages' intent to enforce its contract. Continental exercised its option and purchased the Smith mining interests on September 24, 1974.

On October 16, 1974, Charbonnages brought this action for breach of contract by the defendants Smith, and tortious interference by Continental with plaintiff's contractual rights, seeking specific performance of the alleged contract or, in the alternative, damages of one hundred fifty million dollars.[4] The answers of the various defendants essentially put at issue the critical allegations of contract formation and breach. With the case thus at issue on the pleadings, there then ensued a prolonged and extensive course of discovery punctuated twice by inconclusive motions for judgment on the pleadings and summary judgment[5] before the entry on June 15, 1977 of the summary judgment for defendants from which this appeal was taken.

---

3. By this reference to the May 16 letter of intent, Charbonnages was apparently asserting its understanding that all of the elements of that document that could survive the renegotiation of the three-way arrangement involving Apex were intended to survive. This could not of course be conclusively established by Charbonnages' unilateral assertion. What effect, if any, its assertion by Charbonnages in its "acceptance" had upon the contract negotiations remains, with other matters discussed in the body of the opinion, a part of the larger material fact still in genuine issue: whether the parties had manifested their mutual assent to create a contract.

4. The complaint also sought rescission of any executed transfer of the subject property to Continental, or in the alternative an injunction pendente lite against such a transfer. A temporary restraining order was entered but subsequently dissolved in conjunction with denial of plaintiff's motion for preliminary injunction. The action then proceeded essentially as one for damages.

5. As to which, see note 14 *infra*.

## II.

In Chief Judge Parker's oft-cited formulation for this Court, summary judgment "should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950) (reversing grant of summary judgment in contract breach case). It is not appropriate "even where there is no dispute as to the evidentiary facts but only as to the conclusions to be drawn therefrom." *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951). The burden is on the moving party to "show" that there "is no genuine issue as to any material fact" and that he "is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967). In determining whether this showing has been made, we must assess the evidence as forecast in the documentary materials before the district court in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). This means that the assessment required is substantially similar to, although perhaps even more stringent than, that involved in the assessment of actual evidence on motions for directed verdict. *See Pierce v. Ford Motor Co.*, 190 F.2d at 915. Where, as here, the nonmoving party would on trial carry the burden of proof, he is therefore entitled, as on motion for directed verdict, to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered. *See generally* 10 Wright & Miller, *Federal Practice and Procedure: Civil* § 2713, at 406–10, § 2716, at 431–32; *see also* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.J. 745, 748–49 n.19 (1974). Implicit in these basic rules is a consequence, frequently expressed as a maxim, that summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of claim or defense. *See, e. g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Denny v. Seaboard Lacquer, Inc.*, 487 F.2d 485, 491 (4th Cir. 1973). This reflects a general perception that whether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving. *See, e. g., Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir. 1970) (importance of "demeanor" evidence); *Empire Electronics Co. v. United States*, 311 F.2d 175, 179 80 (2d Cir. 1962) (reliance on circumstantial evidence).

The essence of contract formation[6] is, in the traditional formulation, a "meeting of the minds" of the contracting parties, or in the more accurate contemporary formulation, their manifestations of mutual assent to a bargained-for exchange of promises or performances. *See Restatement (Second) of Contracts* §§ 19–23 (Tent. Draft Nos. 1-7, 1973). The latter formulation makes plain what the former certainly contemplated but obscured, that the intentions manifested in negotiations rather than any had but not disclosed are controlling. *Id.* § 19, Comment c; *id.* § 21B. This being so, disputes about whether a contract has or has not been formed as the result of words and conduct over a period of time are quintessentially disputes about "states of mind," since they involve not only the subjective intentions had by the several parties but what "states of mind," what under-

---

**6.** The substantive law of contract formation that controls in this diversity case is that of West Virginia. We have looked to West Virginia cases and to general authorities in applying the elementary principles pertinent to decision.

standings, their manifestations of intention may have induced in others. These subjective states and objective manifestations of intention present interpretive issues traditionally understood to be for the trier of fact. *See, e. g., Cram v. Sun Insurance Office, Ltd.,* 375 F.2d 670, 674 (4th Cir. 1967). While there may of course be situations in which the manifestations of intention of both parties to be bound, or of either not to be bound, are so unequivocal as to present no genuine issue of fact, this will but rarely be so in protracted negotiations involving a "jumble of letters, telegrams, acts, and spoken words." *Restatement (Second) of Contracts, supra* § 21A, Comment a. Ordinarily in such cases, the issue whether there has at any time been the requisite manifestation of mutual assent to a bargained exchange will be one of fact in genuine dispute so as to preclude summary judgment. *See Cram v. Sun Insurance Office, Ltd.,* 375 F.2d at 674. So, we hold, was that issue in genuine dispute here, and so was summary judgment inappropriate.

In the district court's analysis,[7] the critical point was its perception that "the evidence . . . is undisputed that Plaintiff could not accept an offer made by Smith to sell the Smith family interests without prior approval of the French National Government." From this premise its legal analysis of the culminating stages of the negotiations proceeded inexorably through the following steps: 1) The cablegram sent to Charbonnages by Bernstein on July 18, 1974 constituted an offer by Smith to sell the Smith family interests. 2) But this offer, being unsupported by any independent consideration that would make it an option offer, was subject to revocation by the offeror Smith at any time before acceptance. 3) Acceptance could only be effected after (and possibly by) French Government approval of the offer as communicated to Charbonnages. 4) Before the act of approval by the French Government, or at least before the fact of its approval was communicated to Smith, Smith effectively exercised his power to revoke the offer. 5) There having been no "meeting of the minds" between Smith and Charbonnages due to the offer's revocation prior to its acceptance, no contract was formed to be breached by the Smith interests or tortiously interfered with by Continental. 6) Defendants were therefore entitled to judgment as a matter of law.

The validity of this analysis depends upon the validity of the premise first stated: that French Government approval was a condition to Charbonnages' power to "accept" the Smith "offer." On this precise matter the district court erred [8] and the error requires us to reverse. The manifested intention of the parties respecting the effect of French Government approval upon their negotiations was and remains a material fact in genuine issue. It is quite possible for an acceptance that contains a condition nevertheless to be unconditional as an acceptance and thereby to manifest assent to an offer and create a contract. This occurs when the offer itself contains either expressly or by implication a condition, so that it invites acceptance with the condition

---

**7.** This is recorded in an unreported memorandum opinion of the court, App. 1029–1035, that reflects a view of the "facts" and the law as here summarized. While such an analysis is helpful as a framework for appellate review, the scope of our review is not thereby limited as we indicate in Part III of this opinion.

**8.** The exact significance ascribed by the district court to the necessity of French Government approval is not clear. That it was a condition whose fulfillment was necessary to create any ultimate duty of performance was indeed "undisputed" on the record. It is plain that the parties understood and intended it to have at least this ultimate significance. Whether they further intended that its fulfillment was necessary as a pre-condition to, or indeed the exclusive means for, "acceptance" of the Smith proposal, is precisely the material fact we find in genuine issue. There is one other theoretical possibility: that as a matter of French law it was a condition affecting the very capacity of Charbonnages to enter into the contract. If this were the case, what the parties may have understood or intended would presumably be irrelevant. While such a state of French law could be decisive, the summary judgment record is devoid of any material showing this, so that if this is what the district court had in mind, there is no basis for its "finding." *See* Fed.R.Civ.P. 44.1.

intended to affect only the duty of performance under the contract as formed. *See Hartmann v. Windsor Hotel Co.*, 132 W.Va. 307, 52 S.E.2d 48 (1949); *Restatement (Second) of Contracts, supra* § 60, Comment b, where the following illustration of this possibility is given.

> 2. *A* makes a written offer to sell *B* a patent in exchange for *B*'s promise to pay $10,000 if *B*'s adviser *X* approves the purchase. *B* signs the writing in a space labelled "Accepted:" and returns the writing to *A*. *B* has made a conditional promise and an unconditional acceptance. There is a contract, but *B*'s duty to pay the price is conditional upon *X*'s approval.

And the duty of both parties to perform may be conditioned upon such an event, if this is what is intended by the offer as accepted. 3A *Corbin, Contracts* § 629A (1950 & Supp.1971). In this case that may not have been the manifested intention of the parties, but the issue was one genuinely in dispute on the record before the district court. Without attempting to anticipate proof on the matter, if the course of dealings between these parties as revealed on the summary judgment record were presented as evidence to a trier of fact, it might readily infer a manifested mutual intention that French Government approval would, and could as a practical matter, only be sought after, not before the parties had entered into a contract otherwise binding them to performance.

With this critical premise revealed as a material fact genuinely in issue, the district court's further analysis leading to summary judgment necessarily fails. For if the power of acceptance were found as a matter of fact not intended to be contingent upon prior or contemporaneous French Government approval, a trier of fact might then further conclude that Smith's July 18, 1974 offer by cable was effectively accepted by Bernstein's telephonic and mailgram communications to Smith on July 22 and 24,

1974 reporting "favorable action" by Charbonnages' Executive Committee. Because this occurred before Smith's "change of mind" was first reported to Bernstein on August 2, 1974, a trier of fact might then find that as of the acceptance date there was the requisite manifestation of mutual assent to the cabled offer of July 18, 1974. On this interpretation of the manifested intentions of the parties, a contract would have been formed upon Charbonnages' acceptance, with the mutual promises of the parties providing the agreed exchange and the required consideration each for the other. *Crowley v. Vaughan,* 88 W.Va. 223, 225, 106 S.E. 539, 540 (1921). With such a contract formed, subsequent French Government approval would entitle either party to demand performance, while a failure of approval would discharge both from any obligation to perform.

### III.

By this analysis which necessarily focuses on the narrow but decisive point on which we find reversible error, we of course intimate no opinion on the merits of the case as it is remanded for further proceedings. We are not bound on review to consider only those specific grounds upon which the district court based its grant of summary judgment, but could affirm if we perceived alternative grounds.[9] *See* 10 Wright & Miller, *supra* § 2716, at 440. Our analysis of the record before the district court convinces us that summary judgment was not warranted on any alternative basis there revealed and urged. The general issue of whether at any time during these protracted negotiations these parties have effectively manifested their mutual assent to a bargain which can now be enforced by the courts thus remains in genuine dispute. Subsumed within it are various sub-issues that have not been formally addressed by either the district court or this court in dealing with the grant of summary judg-

---

9. At least any alternative grounds that had been presented both to the district court and on appeal so that the nonmoving party has had fair opportunity to contest them at both levels, thereby avoiding the vexed problem of raising "new issues" or "theories" on appeal. *See* 10 Wright & Miller, *supra* § 2716, at 345–46.

ment. Unless otherwise resolved on remand these issues must now be submitted to the trier of fact for resolution. We cannot of course anticipate the course of that submission in detail, but it may be appropriate to address a few points presented on this appeal that, although not dispositive here, could arise as important issues on remand.

First, our concentration on the culminating cable, telephonic, and mailgram communications that were treated by the district court as the decisive elements in determining whether "minds had met" does not indicate any perception on our part that only in these could there be found the requisite manifestation of mutual assent for contract formation on this record. While identifiable offer and acceptance are the classic mechanisms for contract formation, "manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." *Restatement (Second) of Contracts, supra* § 22(2). Whether any such possibility exists in this case must of course await actual proofs.[10]

Because of its conclusion that Smith's "revocation" forestalled any acceptance by plaintiff of Smith's "offer," the district court understandably did not address several points urged by defendants on appeal as alternative bases for upholding the summary judgment. Although we consider none to have merit as an alternative basis for affirmance, we will discuss three because they involve important issues that could surface for resolution by the trier of fact on remand.

The defendants urge that the terms in Smith's "offer" as cabled on July 18, 1974, were so uncertain that they created no power of acceptance in Charbonnages. An offer must be certain in its essential terms to create a power of acceptance; but

this certainty need only be a reasonable certainty sufficient to allow a finding of breach and the giving of an appropriate remedy. Here again the issue is whether notwithstanding any uncertainty of terms, the parties nevertheless intended to conclude a binding agreement. *See, e. g., Townsend v. Stick,* 158 F.2d 142, 145 (4th Cir. 1946); *Broemsen v. Agnic,* 70 W.Va. 106, 108, 73 S.E. 253, 254 (1911); *Restatement (Second) of Contracts, supra* § 32. It could not be said as a matter of law on this record that the terms in Smith's cabled "offer" were so uncertain as to preclude binding acceptance, since terms not expressly contained in an operative offer may be inferred from other communications between the parties and from surrounding circumstances to round out the terms to which mutual assent was manifested.[11] *See, e. g., Scraggs v. Hill,* 37 W.Va. 706, 713–14, 17 S.E. 185, 187–88 (1893); *Restatement (Second) of Contracts, supra* § 32, Comment a. Again, this depends upon the manifested intentions of the parties, a material fact in genuine issue on the summary judgment record. Next, defendants urge that the parties indisputably manifested an intention that their oral agreements and informal memoranda should be reduced to writing in an integrated contract and that no contract could result until this had been done. On the record before the district court, a contrary inference that the parties intended to be bound prior to the formal integration of their agreement is clearly supportable. An intention to reduce an agreement to writing does not compel the conclusion that this is a condition to the formation of contract. This too depends on the parties' manifested intentions, *see Townsend v. Stick,* 158 F.2d at 145; *Parker v. Knowlton Construction Co.,* 210 S.E.2d 918, 926 (W.Va.1975); and on the summary judgment record before the district court the manifested intentions of the parties on

---

**10.** Charbonnages has consistently urged that contract might be found on the basis of events transpiring earlier in the negotiations. We agree that this remains an open issue on remand.

**11.** Indeed it is an open question whether contract might have been formed with the requisite certainty of terms independently of this precise "offer." *See* note 10 *supra.*

this matter could not be resolved as a matter of law.

 The defendants have also argued somewhat ambiguously on appeal that as a matter of undisputed fact there was no effective communication of the Smith offer to Charbonnages, because Bernstein lacked agency power either to send it for Smith or to receive or accept it for Charbonnages. The district court apparently concluded either that as a matter of undisputed fact the offer was communicated, or that this was at least a matter in genuine dispute on the summary judgment record.[12] We agree with the latter of these possible bases. Communication of an offer can be made by an agent of the offeror, or received by an agent of the offeree. *See Townsend v. Stick,* 158 F.2d 142 (4th Cir. 1946); *Dyer v. Duffy,* 39 W.Va. 148, 19 S.E. 540 (1894). The summary judgment record did not permit any issue of agency powers or of intentions about the offer's communication to be resolved as a matter of law within this principle. Conflicting factual inferences going both to the existence of agency and to the parties' intentions respecting communication of the "offer" abounded on that record. Since they may or may not similarly arise on actual proof, we merely note the ambiguity of the parties' manifested intentions on this matter as revealed on the record. On the one hand Bernstein's suggestion that Smith send a cable directly to Charbonnages, Smith's stated intention to do so after consulting his lawyer, his failure to do so, and Bernstein's obvious anxiety about whether it had been sent all point in one direction, while Smith's careful study and revision of the draft proposal, followed by his deliberate signing of the proposal before handing it over to Charbonnages' attorney with specific knowledge that the attorney intended to send it, his failure to question the attorney's authority to communicate it when apprised of its acceptance, and the earlier course of dealings in which all parties had clearly recognized and enlisted the authority of Bernstein and McCarthy to transmit critical communications to Charbonnages point in another direction. Depending upon resolution of the factual issues going to the parties' intentions on this matter, it could be concluded as a matter of law that the offer was effectively communicated by Smith to Charbonnages when the signed cablegram draft was handed by Smith to Bernstein, or at least when the text as agreed was received by Charbonnages; or, on the other hand, that no communication was intended by the parties until Smith sent a cable directly.

 Finally, we note a contention made by Charbonnages on appeal related to an issue that could be critical in further proceedings. This is the suggestion that the summary judgment did not purport to affect Charbonnages' claim against Continental for tortious interference with contract. We disagree. It is plain from the district court's memorandum opinion[13] that the court concluded that because as a matter of law there was no contract between the Smith interests and Charbonnages, there could be no tortious interference by Continental. But because we find the matter of contract formation not properly resolved by summary judgment, the summary judgment given Continental on that basis is also in error. The district court did not address the question whether if a contract had been formed, there were then material facts in genuine issue respecting Continental's tortious interference with resulting contractual rights. On the record before the district court this was not subject to resolution as a matter of law. On remand, that issue is for the trier of fact under appropriate instructions, depending upon the proofs adduced.

Whatever the ultimate merits of this typically difficult contract negotiation case, it involves serious business transactions carried on in presumed good faith by a

---

12. The district court's memorandum opinion concluded that: "Mr. Smith made an offer to sell the subject matter of this litigation to Charbonnages by the cablegram of July 18, 1974." App. 1034.

13. App.1035.

foreign national business entity with American interests, with substantial properties and money at stake, and with undoubtedly great expense already incurred. It has now been pending for almost five years without reaching trial on the merits.[14] Upon remand it deserves the most expeditious consideration possible.

REVERSED AND REMANDED.

14. A considerable portion of this elapsed time can be traced to a tortured procedural development that involved on the part of the Smith interests two, and on the part of Continental three, successive motions for summary judgment (or motions so treated under Fed.R.Civ.P. 12(c)), with extensive discovery interspersed. Following a year of discovery the district just first assigned the case denied successive summary judgment motions on November 4, 1975 and again on June 2, 1976. Acting on the Smith's second and Continental's third successive motion, a second district judge on June 15, 1977, granted the motions and entered the summary judgment from which this appeal was taken. Plaintiff urged as an alternative basis for reversal on this appeal the invalidity or inappropriateness of the "reversal" of the first trial judge by the second. Our disposition of the appeal makes it unnecessary to address that issue.