**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LONGWOOD ELASTOMERS,
INCORPORATED,
Plaintiff-Appellant,

v.                                                          No. 95-3124

AEROQUIP CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-93-988-R)

Argued: July 10, 1996

Decided: October 29, 1998

Before RUSSELL* and WIDENER, Circuit Judges,
and HALL, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Arthur D. Grossman, FOX & FOX, Newark, New Jersey,
for Appellant. William R. Rakes, GENTRY, LOCKE, RAKES &

_____

*Judge Russell heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel. 28 U.S.C. § 46(d).

MOORE, Roanoke, Virginia, for Appellee. **ON BRIEF:** Gregory J. Haley, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff-appellant Longwood Elastomers Inc. (Longwood), a Virginia corporation, appeals the district court's entry of an adverse judgment in a fraud and breach of contract action against defendant Aeroquip Corporation (Aeroquip). The suit arose from the November 1991 sale by Aeroquip to Longwood of Aeroquip's manufacturing plant in Wytheville, Virginia. Longwood's appeal pertains only to the disposition of those claims relating to the weld fittings product line at the plant, namely: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; and, (4) breach of duty of good faith and fair dealing. The district court entered a final judgment incorporating its February 24, and August 30, 1995 interlocutory orders granting Aeroquip's motion for summary judgment on the foregoing claims and denying Longwood's motion for reconsideration. Longwood Elastomers, Inc. v. Aeroquip Corp., C.A. 93-0988-R (W.D. VA. Nov. 14, 1995). See also Longwood Elastomers, Inc. v. Aeroquip Corp., C.A. 93-0988-R Mem. Op. (W.D. VA. Feb. 24, 1995). We affirm.

In or about 1990 Aeroquip decided to sell its plant in Wytheville, Virginia. The Wytheville plant manufactured and sold molded rubber products, primarily for transportation related industries, included in which was Aeroquip's Railroad Products Group. In preparation for the anticipated sale, and in order to round-out the railroad group, in 1990 Aeroquip relocated its weld fitting production from its Cary, Illinois plant to Wytheville. The weld fittings were sold by Aeroquip to railroads to be utilized in brake assemblies.

2

Aeroquip retained investment bankers Goldsmith Agio & Co. to prepare an Offering Memorandum, which was completed in August 1990. The most relevant aspects of the Offering Memorandum are as follows. It stated that the Wytheville weld fittings operation generated about $1 million in sales each year and that the other railroad products yielded $4.3 million annually. It otherwise included the weld fittings within the railroad group, including for the purposes of providing historical financial information and financial projections. The Offering Memorandum projected that the railroad products line, thirty percent of the Wytheville business, would increase by nine percent. It did not, however, make any projections for the weld fittings line itself, which constituted twenty percent of the railroad products line. Finally, the Offering Memorandum specifically disclaimed liability on the part of Goldsmith or Aeroquip as to the accuracy and completeness of the Memorandum, and disavowed any liability for representations or omissions in it or any other written or oral communications provided during the recipient's evaluation of the company.*

Longwood, based in part on the Offering Memorandum and after what it calls "extensive presentations by Wytheville personnel on all aspects of the business including a discussion of product lines," expressed an interest in purchasing the plant. Shortly thereafter, on November 21, 1990, Longwood signed a letter of intent to purchase the business for $15.5 million. Longwood then engaged in a thorough 12 month due diligence investigation. Although Longwood was required to direct all its inquiries to four of the Aeroquip managers, the district court noted that both of the principal officers of Longwood

_____

*Specifically, the Memorandum provided:

> neither Aeroquip nor GAC makes any representation or warranty as to the accuracy or completeness of this Memorandum and shall have no liability for any representations (expressed or implied) contained in, or for any omissions from, this Memorandum or any other written or oral communications transmitted to the recipient in the course of the recipient's evaluation of the Company.

> This Memorandum contains certain statements, estimates and projections . . . which assumptions may or may not prove to be correct. No representations are made as to the accuracy of such statements, estimates or projections.

3

testified that all their requests for information were fulfilled and answered satisfactorily. Further, over the course of the year, it became apparent to everyone that Aeroquip's sales projections has been overly optimistic. Additionally, Longwood had the benefit both of financial projections by two of its lenders, Chase Manhattan Bank and Chemical Bank, and what is called a businessman's review by Ernst & Young prepared in April 1991.

As Longwood's investigation wound to a close, the parties negotiated a Purchase Agreement, in which Aeroquip agreed to a $400,000 reduction in the sales price. The deal was closed on November 26, 1991, after which Longwood employed two of Aeroquip's top Wytheville managers, Richard Dickerson (general manager) and Paul Coman (product manager). Both of these managers not only made substantial equity investments in Longwood, as required by subscriptions negotiated prior to closing, they both certified that the representations and warranties in both the purchase agreements and exhibits were true and accurate.

Longwood's claims for fraud and breach of contract underlying this appeal arise from Aeroquip's alleged failure to disclose material information regarding the market for the weld fittings products. Longwood asserted that Aeroquip was aware "that the weld fitting market was about to undergo a precipitous and permanent decline." As the district court noted, Longwood relied primarily on a memorandum of March 27, 1991 to General Manager Dickerson from Wytheville Sales Manager Coman. That memorandum discusses the effect of Rule 88 in the Interchange Field Manual of the American Association of Railroads. The rule, enacted almost 20 years earlier, requires that all new and officially rebuilt railroad cars have welded brakepipe fittings, instead of grip seal fittings. The district court noted that the market for retro-fitting existing cars was a closed-end one, and by 1991 the demand for this one-time modification was nearing an end. Longwood cited the fact that the memorandum in question discussed the effects of Rule 88, and projected the sales of weld fittings as declining to $615,000 in 1994 as evidence that Aeroquip knew that the decline in sales during the preclosing period was not merely an effect of a temporary recession. Dickerson testified that he told Aeroquip manager Rick Morgan to notify Longwood of the predicted decline and that Morgan rebuffed the suggestion as unnecessary.

4

Longwood also highlights that two other Aeroquip internal memoranda each differed with the growth predictions of the Offering Memorandum. First, an October 30, 1990 memorandum from Aeroquip's controller, R.C. Copple, to Morgan used a "pessimistic growth scenario" of five percent, not nine. Second, on a memorandum to Coman describing the effects of Rule 88, T.S. Olsen, the product manager, stated "we are presently at or close to the top of a curve representing the requirements for fittings to be supplied to repaired cars. I expect this curve to plummet sharply."

Longwood argued that Aeroquip's alleged failure to reveal its knowledge of the Rule 88 effect on the sale of weld fittings constituted fraud, negligent misrepresentation, or at least breach of duty of good faith. Further, Longwood argued that this alleged concealment or nondisclosure violated one or several sections of the Purchase Agreements, namely: § 4.4 "No Material Adverse Changes"; § 4.18 "Full Disclosure"; § 4.19 "Conduct of the Wytheville Business"; § 6.2 "Access"; and, § 6.4 "Updating of Information." Longwood claims that as a result of Aeroquip's alleged fraud, Longwood believed that the profit from weld fittings sales through the year 2001 would be higher by between $2,421,825 and $4,338,78 than Longwood now projects. Accordingly, Longwood is suing for these damages.

In response, both at trial and in its brief, defendant Aeroquip stressed the existence of other documents discussing the decline during the due diligence investigation throughout 1991. In particular, a memorandum sent by Dickerson to Morgan on July 11, 1991 attributed the decline to the 1991 recession. Dickerson also sent a copy of that memorandum to Longwood's Chief Executive Officer Hartnett. Dickerson testified that the weld fitting information in the memorandum was accurate at the time to the best of his knowledge, and that he "did not at that time consider any of Rule 88 information as part of that decline."

Additionally, Aeroquip notes that Coman, in a telling May 5, 1993 memorandum to Dickerson, almost 18 months after the closing date, indicated his belief that Rule 88 had not been a"major factor" in the business in several years. Significantly, Coman stated that "the slip in 1991 was due to recessionary reasons - not Rule 88" and that he was "unable to define any loss of business - if any."

5

The district court ruled that Aeroquip had met its burden for summary judgment on these issues in accordance with the standard set forth by Federal Rule of Civil Procedure 56(c), Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979), and Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 513 U.S. 813 (1994).

The district court granted summary judgment dismissing the claim of fraud on the grounds that Longwood did not show the elements set forth in Van Deusen v. Snead, 441 S.E.2d 207, 209 (Va. 1994). The court found there was neither a representation specific to weld fittings, nor an actionable nondisclosure. Additionally, the court found that the sales predictions cited by Longwood were opinions or assumption, not existing facts, and that these predictions were accompanied by an express disclaimer, such that reliance was not justified. Finally, the court noted that Longwood's independent investigation precludes a finding of reliance by Longwood on Aeroquip's statements.

The court similarly granted summary judgment as to the breach of contract claim. The court refused to indulge Longwood's argument that certain sections of the contract required Aeroquip to volunteer information about the decline of future weld fittings sales. The court found that on its face the Purchase Agreement did not address future sales of weld fittings, and that the Agreement's integration clause prevented the projections of the earlier and separate Offering Memorandum from falling within the ambit of the Purchase Agreement.

The court granted judgment as a matter of law on the issues of negligent representation and breach of duty of good faith. The court followed Haigh v. Matsuhita Electric Corp., 676 F. Supp. 1332, 1349-50 (E.D. Va. 1987), which held that the courts of Virginia have refused to adopt the tort of negligent misrepresentation. Likewise, A&E Supply Co. v. Nationwide Mutual Fire Ins. Co., 798 F.2d 669, 671-72 (4th Cir. 1986), cert. denied, 479 U.S. 1091 (1987), reaffirmed that this court ordinarily rejects, an independent cause of action, tort claims under Virginia law for breach of contract, even where an improper motive on the part of the breaching party is alleged.

We affirm the district court's grant of summary judgment on the claims relating to the weld fitting for the reasons stated in the district

6

court's opinion. In oral argument Longwood agreed that not only did it profit from this arms-length deal, but that it got a "good deal," and did not want the transaction set aside. It is not an exaggeration to remark that, despite its awareness during the investigation period that weld fittings sales were below the predictions of the Offering Memorandum, Longwood now seeks an interpretation of the Purchase Agreement so that something even better is realized. We decline the invitation.

The judgment of the district court is accordingly

AFFIRMED.