**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-1248**

─────────────

EAST COAST STORAGE EQUIPMENT CO INC,

       Plaintiff - Appellant,

    v.

ZF TRANSMISSIONS GRAY COURT LLC; ZF NORTH AMERICA INC,

       Defendants - Appellees,

and

THS CONSTRUCTORS INC,

       Defendant.

─────────────

Appeal from the United States District Court for the District of South Carolina, at Greenville.  Timothy M. Cain, Chief District Judge.  (6:21-cv-01574-TMC)

─────────────

Argued:  May 7, 2025                      Decided:  December 30, 2025

─────────────

Before NIEMEYER and BENJAMIN, Circuit Judges, and KEENAN, Senior Circuit Judge.

─────────────

Vacated and remanded by unpublished opinion.  Judge Benjamin wrote the opinion, in which Judge Keenan joined.  Judge Niemeyer wrote a dissenting opinion.

─────────────

**ARGUED:**  Adam C. Bach, TONNSEN BACH, LLC, Greenville, South Carolina, for Appellant.  Sean P. McNally, TROUTMAN PEPPER LOCKE LLP, Charlotte, North Carolina, for Appellees.  **ON BRIEF:**  Emily R. Godwin, TONNSEN BACK, LLC, Greenville, South Carolina, for Appellant.  William J. Farley III, TROUTMAN PEPPER HAMILTON SANDERS LLP, Charlotte, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

DEANDREA GIST BENJAMIN, Circuit Judge:

This case arises from a construction project contract dispute between East Coast Storage Equipment Co., Inc. ("East Coast"), a manufacturing company, and ZF Transmissions Gray Court, LLC, and ZF North America, Inc. (collectively, "ZF"), two technology companies. The district court granted summary judgment to ZF on all claims, finding that East Coast received the full benefit of its bargain. We disagree—and therefore vacate the district court's judgment and remand for further proceedings.

I.

East Coast is "a manufacturer, custom fabricator, erector, installer, and distributor of" racking systems.[1] J.A. 14.[2] The two companies comprising ZF are "global technology compan[ies] that suppl[y] industrial technology and technology systems to the automotive industry. *Id.* at 15

Corey Collins, a launch manager at ZF, contacted John Geddes, East Coast's director of sales and racking specialist, to discuss the potential design, manufacture, and installation of a racking system for ZF's expansion at its Gray Court, South Carolina, facility. A few days later, Geddes and another East Coast representative met with

---

[1] Racking systems, or "automated storage and retrieval system[s] ('ASRS') . . . [are] an automated system that retrieves automotive parts from storage racks in order to fulfill customer orders." J.A. 71.

[2] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers for citations to the J.A. utilize the "JA#" numbering at the bottom of the page on each document.

representatives from ZF and Ghafari Associates, LLC, the architect for the project. At the meeting, the attendees discussed the roles of each participant in issuing a request for quotation ("RFQ")[3] to prospective general contractors. The meeting minutes distributed by ZF specified each participant's role and indicated that East Coast would provide detailed racking drawings to be included in the RFQ.

After the meeting, Christoph Zepf, ZF's director of purchasing, spoke separately with Geddes. Zepf and Geddes have differing accounts of this conversation. Geddes testified that during this private conversation, Zepf promised that in exchange for East Coast's racking drawings, ZF would guarantee East Coast exclusive rights to supply the racking structures for the project and its revenue would come from the contract with the winning bidder. Zepf testified that he only promised that East Coast would be included in the RFQ process as a preferred supplier: he did not guarantee that East Coast would be selected by the general contractor or any monetary compensation.

A little over a month after this meeting, East Coast submitted design drawings to ZF, which were sent to bidders the same day. With East Coast listed as its racking system supplier, THS Constructors, Inc. ("THS"), "a foreign construction services corporation," J.A. 15, ultimately won the project. ZF and THS executed an agreement to confirm that THS would serve as the project's general contractor. East Coast and THS subsequently executed a subcontract, which included immediate payment to East Coast.

---

[3] An RFQ is used to solicit bids from general contractors. *See* J.A. 16, 20.

4

After several days without receiving the agreed payment, East Coast's counsel formally requested immediate payment from THS.  While awaiting payment, East Coast continued to work on the project by meeting with a steel manufacturer in preparation for steel manufacturing to commence.  THS sent ZF a draft response to East Coast's request.  ZF encouraged THS to terminate its relationship with East Coast and find an alternative racking supplier—all unbeknownst to East Coast.

The day after ZF and THS discussed East Coast's request for payment and terminating East Coast from the project, East Coast requested access to the project site for its racking manufacturer's engineer to verify dimensions.  ZF denied East Coast's request, claiming it was untimely made.  East Coast indicated it would reschedule the visit for two weeks later, but ZF never confirmed access would be granted.

The following week, per ZF's request to solicit other racking suppliers, THS informed ZF that it had solicited six potential substitute racking suppliers and forwarded proposals from one of them.  That same day, THS' counsel sent a letter to East Coast's counsel advising East Coast to put a hold on the project.  Days later, East Coast contacted ZF, seeking clarification on THS' letter.  ZF responded that it was consulting with counsel and would reply soon.

ZF later sent a letter to both THS and East Coast, stating that it would not be involved in any contractual dispute between them and that it "expect[ed] each entity engaged in its construction project to fully perform each and every commitment and obligation."  J.A. 346.  However, internal communications between ZF and THS representatives indicate that ZF had been actively involved in the decision to terminate East

5

Coast and had been reviewing potential substitutes for East Coast. *See* J.A. 337–39. East Coast continued working on the project unaware of ZF's intention to terminate East Coast's relationship with both ZF and THS.

The following week, ZF directed THS to choose an alternate racking system supplier. East Coast again requested payment from THS in accordance with their agreement. The next day, THS sought ZF's approval for replacing East Coast and paying East Coast for the estimated costs that it had incurred with the project.

ZF approved a revised request for payment from THS, which excluded payment to East Coast for its costs working on the project. That same day, THS sent East Coast a letter formally terminating its involvement in the project. East Coast was never compensated for the drawings it provided or any of its other work on the project.

## II.

East Coast filed a complaint in state court, raising claims against ZF for, as relevant on appeal, breach of contract, promissory estoppel, unjust enrichment, and quantum meruit. The case was removed to federal court, and ZF unsuccessfully moved to dismiss East Coast's claims.

ZF subsequently moved for summary judgment, which the district court granted in full. *See generally* J.A. 402–19 (district court order). The district court reasoned that East Coast received the full benefit of its alleged agreement with ZF because East Coast was actually hired to supply the racking structures for the project. *See id.*

East Coast timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

6

III.

A.

"We review the district court's grant of summary judgment de novo. Summary judgment is proper only if, viewing the evidence in the light most favorable to the nonmoving party, the case presents no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 947 F.3d 234, 237 (4th Cir. 2020) (citation omitted).

B.

We first address East Coast's breach of contract claim.

"A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Armstrong v. Collins*, 621 S.E.2d 368, 376 (S.C. Ct. App. 2005) (quoting *Roberts v. Gaskins*, 486 S.E.2d 771, 773 (S.C. Ct. App. 1997)). To state a claim for breach of contract, a plaintiff must show "[1] the existence of the contract, [2] its breach, and [3] the damages caused by such breach." *Branche Builders, Inc. v. Coggins*, 686 S.E.2d 200, 202 (S.C. Ct. App. 2009) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962)).

"[T]he existence of a contract is ordinarily a question of fact for the jury." *Stevens and Wilkinson of S.C., Inc. v. City of Columbia*, 762 S.E.2d 696, 701 (S.C. 2014). Proving the existence of a contract requires showing "a meeting of the minds between the parties with regard to *all* essential and material terms of the agreement." *Player v. Chandler*, 382 S.E.2d 891, 893 (S.C. 1989) (citing *Hughes v. Edwards*, 220 S.E.2d 231 (1975)). "A court

7

cannot enforce a contract unless it can determine what it is.  It is not enough that the parties think that they have made a contract."  1 TIMOTHY MURRAY, Corbin on Contracts § 4.1 (Matthew Bender 2025).

As we have previously explained:

> While there may of course be situations in which the manifestations of intention of both parties to be bound, or of either not to be bound, are so unequivocal as to present no genuine issue of fact, this will but rarely be so in protracted negotiations involving a "jumble of letters, telegrams, acts, and spoken words."  *Restatement (Second) of Contracts,* § 21A, Comment a. Ordinarily in such cases, the issue whether there has at any time been the requisite manifestation of mutual assent to a bargained exchange will be one of fact in genuine dispute so as to preclude summary judgment.

*Charbonnages de France v. Smith*, 597 F.2d 406, 415 (4th Cir. 1979).

### C.

East Coast claims that the parties entered into an oral contract wherein East Coast agreed to be the sole supplier of the project's racking system and earn revenue through this role in exchange for providing ZF with the design drawings for the RFQ.  *See* Appellant's Br. (ECF No. 22) at 25.[4]  It argues ZF breached this contract by encouraging THS to terminate East Coast from the project and approving THS' request for payment that excluded payment to East Coast.  *See id.* at 24–26.  ZF responds that there was no breach of contract because East Coast received the racking subcontract it bargained for and no promise of monetary compensation was ever made.  *See* Appellees' Br. (ECF No. 25) at 20–27 (hereinafter "Response Br.").

---

[4] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

8

We find East Coast's argument persuasive.  Viewed in the light most favorable to East Coast, the nonmoving party, a reasonable jury could find that the parties had a contract that included monetary compensation to East Coast in exchange for the design drawings it provided for the RFQ.

1.

First, there is a genuine dispute of material fact as to whether the parties had a contract.  Based on the parties' varying versions of their alleged agreement, a reasonable jury may, or may not, find that the parties had a "meeting of the minds . . . with regard to *all* essential and material terms of the agreement." *See Player*, 382 S.E.2d at 893.  Geddes testified that in his independent meeting with Zepf, Zepf promised that if East Coast provided the design drawings for the RFQ then ZF would guarantee it exclusive rights to supply the racking structures and the revenue associated with that role.  *See* J.A. 102–03.  Zepf, however, testified that he only promised that East Coast would be included in the RFQ process as a preferred supplier: he did not guarantee that East Coast would be selected by the general contractor or any monetary compensation.  *See* J.A. 174–75, 183.[5]

Combined with the lack of conclusory documentary evidence, such differing testimony is sufficient to create a genuine issue of material fact as to whether the parties had a meeting of the minds and entered into a contract.  *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 ("[T]he oral testimony of the plaintiff is a permissible and sufficient means

---

[5] While ZF says on appeal that it promised it would make East Coast "the sole supplier" for the project, Response Br. at 22 (internal quotation marks omitted), that is not what Zepf testified to, *see* J.A. 173–75, nor is it what it argued below, *see* J.A. 72–73, 77, 392.

of establishing that a genuine issue of material fact exists requiring a trial."); *see also Nowlin v. Resolution Tr. Corp.*, 33 F.3d 498, 508 (5th Cir. 1994) ("Determining whether there are two contracts or one contract, and what the parties intended the terms these contracts to embrace, is a very fact specific endeavor."); *Charbonnages de France*, 597 F.2d at 415.

### 2.

But even if a jury were to find that the parties mutually assented to a binding agreement, a genuine dispute of material fact remains as to its terms—namely, whether it included monetary compensation to East Coast in exchange for the design drawings. Geddes testified that Zepf promised that East Coast would derive revenue from the parties' agreement. *See* J.A. 103. THS' actions also indicate that it foresaw East Coast being compensated because it included payment to East Coast on its initial request for payment from ZF. *See id.* at 357–58. Zepf also testified that while he had encountered several subcontractors hired after the general contractor was selected that "provided drawings, detailed specification, and ongoing support without payment," *id.* at 190, he had never come across a sole supplier held to the same expectation. *See id.* at 190–91. He further testified that other participants in the initial meeting, including the project's architect and ZF representatives, were compensated for their roles in the project while East Coast was not. *See id.* at 172, 184.

This competing evidence is sufficient to create a genuine issue of material fact as to whether the parties had a contract that included monetary compensation. *See Player*, 382 S.E.2d at 893.

10

\*      \*      \*

Because we cannot determine whether a breach occurred without first resolving whether a contract existed and what its terms were, these factual disputes prevent us from addressing the remaining elements of East Coast's breach of contract claim.  Accordingly, we vacate and remand for further proceedings.[6]

*VACATED AND REMANDED*

---

[6] We conclude the same with respect to the equitable claims East Coast has asserted. Because East Coast cannot pursue its promissory estoppel claim if it conflicts with the terms of a contract, *see Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 599 (4th Cir. 2004), and because its unjust enrichment and quantum meruit claims cannot proceed if any pertinent contract exists, *see Gibson v. Epting*, 827 S.E.2d 178, 183 (S.C. Ct. App. 2019), the existence and terms of a contract are threshold issues that preclude summary judgment on these claims.  Accordingly, we vacate and remand with respect to these claims as well.

11

NIEMEYER, Circuit Judge, dissenting:

I respectfully disagree with the majority opinion, as I would affirm, in full, the district court's summary judgment.

The record in this case does not support East Coast's claim that it was contractually entitled to or even expected monetary compensation for its drawings. Rather, it presented its drawings to ZF for inclusion in ZF's request for bids on the project with the understanding that ZF would designate East Coast as the sole supplier on the project. And indeed, as it turned out, East Coast was designated the sole supplier, thus fulfilling ZF's only contractual obligation to East Coast.

The official minutes of the meeting where the alleged agreement was reached made note that East Coast "[w]ill provide to Ghafari [ZF] detailed drawings for racking" and that "Ghafari will include in the scope of work that contractors need to include East Coast Racking as one of the subsuppliers to quote the racking system." Moreover, in deposition, East Coast confirmed that it was its understanding that East Coast "would be sole supplier in exchange for these drawings," as John Geddes, the Vice President of Purchasing at East Coast, stated, "I was — I was the sole supplier designing the building." He testified further that during a separate "closed door" meeting with members of the ZF team about that agreement he "was guaranteed that [he] would be the sole supplier." The attorney for ZF then sought East Coast's specific understanding of the agreement, questioning Geddes as follows:

> Q. Did Christof or anyone at ZF that day offer you money in exchange for the drawings?

12

A.  They advised me that I was and would be the sole supplier, and my designs would be used for the bidding process.

Q.  But was there a specific sum of money offered by Christof or anyone else that day to you?

A.  *I was just guaranteed that I would be the sole supplier for the project.*

Q.  Okay.  Did you ever request a specific sum of money from them in exchange for the drawings?

A.  No.  I took their word that we would be the sole supplier and the revenue would be derived from the project, the contract.

(Emphasis added).  That testimony provided East Coast's understanding of the full scope of the alleged agreement.  And ZF confirmed this:  Christof Zepf stated in his deposition, "I was always clear that we wouldn't directly compensate East Coast for the drawings, we would include them in the RFQ, like we stated."

In its request for bids, ZF did specify East Coast as the sole supplier, and indeed, East Coast was ultimately selected as the subcontractor for the racking project, thus fulfilling ZF's agreement, as stated by both East Coast and ZF.

As the district court correctly ruled, these undisputed facts absolve ZF from any liability in this case.  And I have found nothing in the record to undermine the district court's conclusion.  Accordingly, I would affirm the judgment of the district court.  I therefore respectfully dissent.

13