**METRIC/KVAERNER FAYETTE-VILLE, a joint venture of Metric Constructors, Inc. and Kvaerner Enviro-Power, Inc., Plaintiff–Appellant,**

v.

**FEDERAL INSURANCE COMPANY, Defendant–Appellee.**

No. 04–1101.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 27, 2004.

Decided: April 11, 2005.

ARGUED: David Glenn Hymer, Bradley, Arant, Rose & White, L.L.P., Birmingham, Alabama, for Appellant. Thomas McKay, Cozen O'Connor, Cherry Hill, New Jersey, for Appellee. **ON BRIEF**: Scott B. Smith, Bradley, Arant, Rose & White, L.L.P., Birmingham, Alabama; H.

Gerald Beaver, Beaver, Holt, Richardson, Sternlicht, Burge & Glazier, Fayetteville, North Carolina, for Appellant. Elizabeth Chambers Bailey, Cozen O'Connor, Cherry Hill, New Jersey; Anna Daly, Cozen O'Connor, Charlotte, North Carolina, for Appellee.

Before LUTTIG, KING, and SHEDD, Circuit Judges.

Vacated and remanded by published opinion. Judge KING wrote the majority opinion. Judge SHEDD wrote a concurring opinion. Judge LUTTIG wrote a dissenting opinion.

KING, Circuit Judge:

Metric/Kvaerner Fayetteville ("M/K") appeals the district court's awards of summary judgment to Federal Insurance Company ("Federal") in this insurance dispute. In June 1999, M/K initiated this proceeding against Federal in the Superior Court of Cumberland County, North Carolina, seeking to recover on two claims it had made under insurance policies issued by Federal. Federal removed the case to the Eastern District of North Carolina on the basis of diversity of citizenship, and the district court granted summary judgment in its favor, ruling that M/K's claims were barred because it had failed to comply with policy conditions requiring timely notice of loss. *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, No. 5:99–CV–448–BR(3) (E.D.N.C. Dec. 11, 2003) (the "Opinion"). On appeal, M/K contends that summary judgment was inappropriate and that genuine issues of material fact are presented. As explained below, we agree with M/K, and we vacate and remand.

## I.

### A.

In April 1992, BCH Energy Limited Partnership ("BCH") entered into a contract with the contiguous North Carolina counties of Bladen, Cumberland, and Hoke, for the design, construction, and operation of a waste-to-energy project that would generate electricity by processing municipal waste into fuel (the "Project").[1] M/K, a joint venture composed of Metric Constructors, Inc., and Kvaerner Environmental Technologies, Inc., submitted a proposal to BCH for the design and construction of the Project.

In April 1993, M/K entered into a "Turnkey Design and Construction Agreement" with BCH, under which M/K agreed to be the construction contractor on the Project in exchange for a fee of at least $58 million (the "Project Agreement"). The Project Agreement provided, *inter alia,* that M/K would design and build two separate facilities for the Project, pursuant to BCH's overall design specifications: a municipal refuse recycling facility near Fayetteville in Cumberland County (the "Recycling Facility"), and an energy generating facility approximately eighteen miles away in Bladen County (the "Energy Facility") (collectively, the "Facilities"). The concept underlying the Project was that raw municipal waste collected in the three counties would be processed at the Recycling Facility and then compacted, baled, and transferred to the Energy Facility. At the Energy Facility, the baled municipal waste would be processed further and then used to fuel boilers that would in turn power turbine generators. The goal of the Project was to sell electricity gener-

---

1. Because this appeal is from awards of summary judgment to Federal, we present and assess the relevant facts in the light most favorable to M/K, the insured and non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.,* 377 F.3d 408, 418 (4th Cir. 2004).

ated at the Energy Facility to the Carolina Power & Light utility company, and to sell steam produced by that Facility's boilers to a nearby DuPont chemical plant.

Federal, an affiliate of the Chubb Group of Insurance Companies, issued the insurance policies underlying this dispute. First, Federal issued a policy entitled "Energy Industries Project Under Construction Insurance," providing up to $59 million in coverage to its insureds against physical "loss or damage," caused by a "Covered Cause of Loss" during the construction of the Facilities (the "Builder's Risk Policy"). The Builder's Risk Policy was initially effective from November 17, 1993, to December 17, 1995, and it was renewed through at least July 17, 1996.

Second, Federal issued a policy entitled "Energy Industries Property Insurance and Property Business Income Insurance," providing up to $21.3 million in coverage to its insureds for losses suffered to buildings, personal property, and business income during suspensions of the Recycling Facility's operations caused by "direct physical loss or damage" to the facilities by a "Covered Cause of Loss" (the "Operations Policy").[2] The Operations Policy was initially effective from June 23, 1995, to November 17, 1995, and it was renewed through at least February 15, 1997.

The Builder's Risk and Operations Policies (collectively, the "Policies") both identified BCH as the primary insured and M/K as an additional named insured.[3] Significantly, at the outset of its involvement in the Project, M/K knew only of the Builder's Risk Policy and of its status as

an additional insured thereunder. M/K did not know until November 1998 of the existence of the Operations Policy, or that it was named as an additional insured thereunder.

The relevant terms of the Policies, as focused upon by the parties and the district court, are substantially the same. They each specify certain "Conditions" to be complied with by the insureds concerning, *inter alia,* notices of loss or damage, proofs of loss for use in the settlement of claims, and legal actions, as follows:

3. In the event of loss or damage under this insurance [policy], you [insured] must:

. . .

b. *As soon as possible, notify us [Federal] of the loss or damage.* Give us a description of the PROPERTY involved and details as to how, when and where the loss or damage occurred.

. . .

g. File with us, or with our authorized representative, sworn proof of loss containing the information we request to settle the claim. You must do this within 60 days after the date of the loss.

. . .

10. No one may bring a legal action against us under this policy unless:

a. There has been full compliance with all the terms of this policy. . . .

J.A. 758–60 (Builder's Risk Policy) (emphasis added); *see also* J.A. 1499–1501 (Operations Policy) (same).

---

2. The Builder's Risk and Operations Policies both define a "Covered Cause of Loss" as "physical loss or damage to PROPERTY except as excluded." In this Opinion, we refer to losses or damages assertedly covered under the Policies as "Covered Losses."

3. M/K possessed an insurable interest in the Project by virtue of its compensation as the Project's construction contractor. As part of its compensation package, M/K was to receive approximately 25% of the revenues generated by the Recycling Facility, beginning in October 1995.

### B.

### 1.

M/K commenced construction on the Project in approximately November 1993. The Recycling Facility was completed in the fall of 1995, and the Energy Facility was finished in February 1996. During late 1995 and early 1996, problems arose with the equipment at the Energy Facility because personnel at the Recycling Facility had improperly operated that Facility's equipment, including its trommels, magnet, and eddy current separator. As a result, the Recycling Facility produced baled municipal waste containing excessive amounts of unacceptable waste materials, such as metal, aluminum, glass, grit, and moisture, which was delivered to the Energy Facility ("Unacceptable Waste").[4] The Unacceptable Waste caused the formation of a sticky, abrasive substance that jammed the Energy Facility's conveyors, plugged its boiler nozzles, and damaged its fuel-handling system and its boiler tubes. The damages resulting to the Energy Facility, in turn, adversely impacted the performance of the Recycling Facility—in that the Energy Facility was unable to use the baled municipal waste from the Recycling Facility—resulting in a suspension of the Recycling Facility's operations.

These problems caused a substantial loss of revenue and business income to BCH and M/K between November 1995 and December 1996. During that period, BCH insisted to M/K that the losses and damages suffered at the Energy Facility had resulted from M/K's improper implementation of BCH's design criteria for the Recycling Facility. M/K reluctantly concurred in this analysis, under which the coverage provisions of the Builder's Risk

Policy would not have been implicated because the Policy excluded from coverage any loss or damage resulting from a design flaw.

### 2.

During the period of the Project's construction and its early operations, Federal's representatives were regularly present at the Facilities, and Federal was aware of the problems the Facilities were experiencing as those problems were occurring. Between May 1995 and November 1996, a Federal Loss Control Consultant, Bret Martin, inspected the Facilities on at least seven occasions. During those visits, he discussed the Project with the M/K personnel responsible for overseeing it, as well as with other Federal personnel responsible for the Project's insurance coverage. According to Martin, the purpose of inspecting such a project is to verify that the risks associated with the project satisfy Federal's minimum underwriting standards for fire protection, life safety, and disaster recovery, and to assist the insured in meeting those standards. On January 26, 1996, during one of his visits to the Facilities, Martin discussed with Garry Haynes, a senior boiler machinery inspector with Federal, the problems M/K was experiencing with the Energy Facility's boilers and its fuel-handling and conveyor systems. During another such visit by Martin, Everette Compton, M/K's Project Safety Director, advised Martin that portions of the Energy Facility's conveyor system were wearing out more rapidly than M/K had expected. By late January 1996, Martin concluded that the problems associated with the Energy Facility's fuel-handling and conveyor systems resulted directly from BCH's improper design spec-

---

4. The Project Agreement defines "Acceptable Municipal Waste" as solid waste collected by Bladen, Cumberland, and Hoke Counties, including municipal solid waste. Such waste does not include "Unacceptable Waste."

ifications for the conveyor system. Because design flaws were excluded from coverage under the Policies, Federal did nothing on the basis of the knowledge acquired by Martin and his colleagues.

In the fall of 1995, under the threat that BCH would seek damages from M/K because of the problems being encountered at the Facilities, and due to the mounting losses in business income being suffered from the Recycling Facility's suspension of operations, M/K decided that the Project should be redesigned and that the Energy Facility's boilers should be rebuilt. On October 17, 1996, M/K provided Federal with an eight-page report it had prepared for BCH, dated October 8, 1996, detailing the losses and damages suffered by the Facilities, the steps M/K had taken to repair the Facilities, and the status of those remedial actions. In that report, M/K advised BCH and Federal of the following:

- the conveyor system at the Energy Facility was experiencing high failure rates, resulting in M/K replacing worn-out conveyor parts;
- ash was building up in the boilers and in the conveyor system of the Energy Facility, resulting in their shutdown and in M/K's removal of aluminum from the waste being processed;
- the demineralization system of the Energy Facility was deficient in providing the desired flow rate, due to inexperienced operators, use of the wrong chemicals, and incorrect testing of the water quality; and
- the air compressors were not large enough to clean the air at the Energy Facility.

Despite M/K's efforts to redesign, rebuild, and repair the Facilities, and not-

withstanding the additional expenditures it made in connection with those efforts, the Facilities continued to experience operational difficulties. As a result, the Facilities were finally closed down and "mothballed" by BCH in late 1996, and the Project never operated thereafter.[5]

3.

In August 1997, M/K sought to ascertain the extent of the losses and damages it had suffered on the Project, and thus to assess whether the Builder's Risk Policy covered those losses and damages. In that endeavor, it retained Milbourn L. Smith, a waste management consultant, to inspect the Project and to provide his advice on the bases of its problems. Smith's inspection efforts included a review and analysis of the equipment remaining at the mothballed Facilities. Smith also examined and analyzed the records detailing the problems the Facilities had experienced, including the Project's fuel-handling deficiency reports, construction meeting minutes, work orders, and photographic evidence of Unacceptable Waste recovered from the Energy Facility's fuel-handling system. Based on his inspections and analysis, Smith advised M/K that the processing of Unacceptable Waste through the Facilities—rather than a design flaw—had caused the losses and damages suffered by the Project.

In early September 1997, after assessing Smith's conclusions and the related circumstances, M/K decided that the losses and damages suffered at the Energy Facility had not been caused by improper design, as had been previously believed, but by the improper operation of the Recycling Facility. More specifically, M/K concluded that the Energy Facility's damages had

5. In November 1997, a syndicate of banks—which held a first lien on the Project's assets, as well as a security interest on the loan

proceeds—filed an involuntary Chapter 7 bankruptcy petition against BCH seeking, *inter alia,* liquidation of the Project.

resulted from the processing of Unacceptable Waste into baled municipal waste at the Recycling Facility, which was then supplied to the Energy Facility. As a result, M/K decided that the losses and damages suffered on the Project constituted Covered Losses under the Builder's Risk Policy. According to M/K, the losses it suffered as a result of the problems at the Facilities, including the repairs it made to the Energy Facility between late 1995 and October 1996, totalled over $25.4 million.

## C.

### 1.

On September 11, 1997, M/K submitted to Federal its claim under the Builder's Risk Policy, seeking coverage for the losses and damages it had suffered on the Project (the "Builder's Claim"). In its Claim, M/K asserted that the damages resulted from the "introduction of unforeseen types of garbage ... into the [Facilities], the inadequate handling of that garbage by the operators of the [Facilities], and ... the misapplication or malfunction of components of the [Facilities]." The damages included "metal fatigue, metal warping and bending, sand and grit damage, boiler damage caused by oversized sand," and boiler damage caused by aluminum oxides.

On October 28, 1997, Federal acknowledged receipt of the Builder's Claim, by letter directed to M/K's in-house counsel. By letter of December 10, 1997, Federal requested that M/K supply further information on the Claim, to assist Federal's assessment of "whether or not a loss cov-

ered by this policy occurred and the correct application of coverage, if any, for this loss." On April 2, 1998, Federal sent M/K a blank "Sworn Statement in Proof of Loss," with instructions that it be completed and returned to Federal with documentation of the Builder's Claim. M/K failed to respond to these requests because they were not sent to the M/K official handling the Builder's Claim. Meanwhile, according to Federal's Claim Supervisor, Federal did not visit or inspect the Facilities after its receipt of the Builder's Claim, and it neither sought nor conducted any investigative interviews related to the Claim.[6]

On May 18, 1998, Federal denied the Builder's Claim, directing its denial letter to M/K's in-house counsel. In that letter, Federal contended, *inter alia*, that M/K had "failed to notify [Federal] as soon as possible of the loss or damage or to provide inventories as required, failed to provide proof of loss within the appropriate time limit and failed to cooperate with us in the investigation or settlement of the claim."

In August 1998, the mothballed components of the Facilities were sold at auction by order of the bankruptcy court. The auction netted about $2.1 million, which was paid to the bank syndicate in October 1998.

### 2.

In August 1998, during discovery proceedings in a separate lawsuit involving M/K and the bank syndicate, Federal produced business records which were made available to M/K. In November 1998, M/K ascertained that those records included the

---

**6.** Federal's Regional Property Claim Supervisor, Walter Nichols, who was responsible for investigating the Builder's Claim, testified by discovery deposition that, in conducting his investigation, he never spoke (1) with any of Federal's loss control representatives, or (2) with anyone from M/K or BCH. By its responses to Federal's interrogatories in June 2001, M/K identified more than forty persons who had been associated with the Project and thus were potential witnesses to the damages suffered by it.

Operations Policy, which named M/K as an additional insured. At this point, over a year after the Builder's Claim had been submitted to Federal and six months after it had been denied, M/K was first made aware of the Operations Policy's existence and the fact that it was a named insured thereunder. Six months later, in May 1999, M/K concluded that the Operations Policy provided coverage for the losses in business income it had suffered at the Facilities. By letter of May 11, 1999, M/K submitted to Federal its claim under the Operations Policy for Covered Losses in the sum of $10 million to $20 million, resulting from the suspension of operations at the Facilities between November 1995 and December 1996 (the "Operations Claim").

## D.

### 1.

On June 14, 1999, M/K filed this proceeding against Federal in North Carolina state court, seeking damages for Federal's breach of the Policies, specifically, its failure to recognize and pay the Builder's and Operations Claims (collectively, the "Claims"). In its Complaint, M/K asserted that the Project had "suffered unexpected damage resulting in losses" to M/K and that the "property damage also caused delays in [M/K's] completion" of its work on the Project, "resulting in additional losses" to M/K.

In July 1999, after this lawsuit was removed to the Eastern District of North Carolina, Federal denied liability for the Claims asserted by M/K. In August 1999, the suit was stayed by the district court pending related arbitration proceedings.[7] After the stay was lifted in November 2000, the parties conducted extensive discovery, through July 2002, on the factual underpinnings of this dispute. Those discovery proceedings included numerous depositions and interrogatories, as well as the extensive production of documents. The documents produced included M/K's business records relating to the problems at the Facilities and the efforts undertaken to resolve them.[8]

In March 2002, during the discovery proceedings, Mr. Smith, as an M/K expert,

---

7. In addition to this civil action against Federal, M/K has initiated two other proceedings relating to the Project. First, in October 1996, M/K pursued an arbitration proceeding against BCH for breach of the Project Agreement. After BCH counterclaimed, the arbitration proceeding was stayed by the arbitration panel in November 1997, when the bank syndicate initiated the bankruptcy proceeding against BCH. On this record, it is unclear how or whether the arbitration proceeding was concluded. Second, in November 1997, M/K filed a civil action against the bank syndicate in North Carolina state court for fraud and related contract claims. That lawsuit later became part of an arbitration proceeding involving M/K and the bank syndicate.

8. The M/K business records included the following: (1) minutes on a September 1995 meeting among representatives of M/K and two of its subcontractors on the Project, Rader Companies ("Rader") and Keith Manufac-

turing; (2) a letter of September 11, 1995, from M/K to a subcontractor, VEDCO Energy Corporation ("VEDCO"), describing the Unacceptable Waste that M/K believed must be removed from the waste stream at the Recycling Facility; (3) lists, produced on December 4, 1995 to Rader, describing the fuel-handling system's problems and "action" steps being taken to correct them; (4) a report of December 28, 1995, on "sand quality" at the Project; (5) a letter of January 11, 1996, from M/K's Project manager to its construction manager, describing the impact of "bed sand deliveries" on the Energy Facility; (6) an internal M/K memorandum of January 23, 1996, describing operations at the Recycling Facility; (7) a report of February 26, 1996, from M/K to VEDCO, describing a "completion plan" for the Project; and (8) work orders and payment logs detailing costs incurred by M/K in repairing and modifying the fuel-handling system.

submitted a report on the relevant factual issues. As spelled out therein, Smith had reviewed and analyzed the evidence available to M/K regarding the Project and these two Claims. In his report, Smith described the operations at the Facilities and concluded, *inter alia*, that: (1) the operators of the Facilities "did not have the experience to recognize and exercise the proper operating practices"; (2) changes "made to the front end of the process" at both the Facilities "exacerbated the combining and introduction of abrasives" into the recycling process; and (3) it was "reasonable that [M/K] would have initially concluded that the damage [to the Facilities] and delays were caused by design . . . rather than operational issues."

On November 26, 2002, Federal filed a motion seeking summary judgment against M/K on both of the Claims. With respect to the Builder's Claim, Federal asserted, *inter alia*, that M/K had breached the conditions of the Builder's Risk Policy by failing to provide timely notice or to submit a sworn statement in proof of loss. *See* Builder's Risk Policy, Conditions 3.b., 3.g. With respect to the Operations Claim, Federal contended, *inter alia*, that M/K had breached the conditions of the Operations Policy by failing to provide timely notice and by prematurely filing this lawsuit. *See* Operations Policy, Conditions 3.b., 10.a.[9] M/K opposed Federal's summary judgment requests, supported in large part by deposition testimony and the related materials produced during discovery proceedings. M/K maintained that, viewing the evidence in the summary judgment record in the light most favorable to it, genuine issues of material fact were presented on whether it had complied with the pertinent conditions of the Policies.

2.

On December 11, 2003, the district court filed its Opinion, awarding summary judgment to Federal on both Claims. On the Builder's Claim, the court concluded that the cause of the losses and damages suffered at the Project "was vital to the determination of [M/K's] coverage." Opinion at 7. The court also concluded that any investigation by Federal of the Facilities, after submission of the Builder's Claim in September 1997, would have been futile, because the "alleged damage no longer existed." *Id.* The court found summary judgment to be appropriate on the Builder's Claim because, under North Carolina law, "the almost two-year delay between the occurrence of the damage at issue and the reporting of the [Builder's Claim] to Federal in conjunction with the repair of the damage in the interim, materially prejudiced [Federal's] ability to investigate the claim." *Id.* at 8.

On the Operations Claim, the district court accepted the proposition that M/K had no knowledge of the Operations Policy, or that it was an insured thereunder, until it obtained the Policy in the related lawsuit in November 1998. *See id.* at 9. The court found, however, that M/K had without good reason waited six more months—until May 1999—to give notice to Federal of the Operations Claim, and that this six-month delay was fatal to that Claim. *See id.* at 10–11. More specifically, the court stated that it was unable to "conclude that M/K's filing of the claim against Federal under the operations poli-

9. In support of its summary judgment requests, Federal also asserted (1) that the Claims were not for Covered Losses; (2) that the Claims were time barred under the applicable statute of limitations; (3) that M/K had no insurable interest in the Recycling Facility under the Operations Policy; and (4) that the Operations Claim failed on its merits. The district court's Opinion did not address those contentions.

cy in May 1999, over six months after learning of the policy's existence and approximately three years after the alleged business loss, was made in good faith." *Id.* at 11. As a result, the court concluded that summary judgment was also appropriate on the Operations Claim.

M/K has appealed these summary judgment awards, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir.2004). An award of summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Indeed, a dispute presents a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In opposing a summary judgment motion, the non-moving party is entitled to have the "credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it

resolved favorably to him." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). Additionally, an award of summary judgment is seldom appropriate in disputes in which "particular states of mind are decisive as elements" of the claim or defense. *Id.*

## III.

We now turn to an assessment of the propriety of the district court's awards of summary judgment to Federal on the two Claims. In so doing, we first ascertain the relevant principles of North Carolina law governing an insurer's contention that its insured failed to give notice of loss "as soon as possible," and we review pertinent provisions of the Policies. After conducting this analysis, we conclude, as explained below, that the district court erred.

### A.

■ In resolving this diversity action, we are obliged to apply the substantive law of North Carolina, where the two insurance policies were made. *See Seabulk Offshore*, 377 F.3d at 418. In assessing whether an insurer may be relieved of its obligation to indemnify due to its insured's asserted failure to comply with a policy requirement that notice of loss be given to the insurer "as soon as practicable," North Carolina utilizes the test enunciated in its Supreme Court's *Great American* decisions. *See Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 303 N.C. 387, 279 S.E.2d 769 (1981) (*"Great American I"*); *Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 315 N.C. 714, 340 S.E.2d 743 (1986) (*"Great American II"*).[10] Put succinctly, the *"Great*

---

**10.** The policy provision underlying the *Great American* decisions required the insured to give its notice of loss to the insurer "as soon as practicable." In *Great American II,* the court observed that "practicable" is defined as " 'that which is ... possible.' " 340 S.E.2d at 746 (quoting *Black's Law Dictionary* 1055 (5th ed.1979)). Consequently, the policy provision in *Great American* (requiring notice "as soon as practicable") and the relevant provision here (requiring notice "[a]s soon as possible") are substantially the same.

*American* test" is as follows: (1) whether there was a delay in notifying the insurer of a covered loss (the "Notice Element"); (2) if such notice was delayed, whether the insured acted in good faith with respect to the delay (the "Good Faith Element"); and (3) if the insured acted in good faith, whether the insurer was nevertheless materially prejudiced by the delay (the "Prejudice Element"). *See Great American II,* 340 S.E.2d at 746–47.

In this dispute, Federal contends that the Notice Element is satisfied because it was not given any notice of loss or damage concerning the Project until the Claims were submitted by M/K.[11] M/K, on the other hand, contends that Federal has failed to satisfy the Notice Element because it was aware of the losses and damages suffered at the Facilities while they were occurring. Thus, according to M/K, an assessment of the other *Great American* elements is unnecessary.

In its Opinion, the district court held the Notice Element to be satisfied by Federal and relied on the Prejudice and Good Faith Elements to dispose of the Claims. However, the resolution of the Notice Element in favor of Federal—a threshold step in assessing the Claims—is far from clear. It turns on whether, under the Policies, the submission of a "claim" and the giving of a "notice" of loss to Federal by M/K are necessarily the same event, or whether they are separate and distinct occurrences. If these events are deemed to be equivalent, then M/K's submission of the Builder's Claim in September 1997, and its subsequent submission of the Operations Claim in May 1999, constituted the first notices of loss given to Federal by M/K under the Policies. Under that scenario, Federal would satisfy the Notice Element and we would, as did the district court, assess the submission of the Claims under the Good Faith and Prejudice Elements of the *Great American* test. On the other hand, if the submission of a "claim" and the giving of "notice" are not the same event, we must assess whether, under the Notice Element, Federal received actual or constructive notice of the losses and damages suffered at the Facilities prior to the Claims being submitted. Under that scenario, if Federal had notice of M/K's losses and damages while they were occurring, it is untenable for Federal now to contend that it is entitled to be relieved of its contractual obligations to indemnify M/K.

### B.

 In assessing the meaning of the terms "claim" and "notice," we conclude that the submission of a "claim" and the giving of a "notice" of loss or damage are separate and distinct occurrences. In arriving at this conclusion, we are guided by familiar principles of construction. First, an insurance policy should be construed to give different meanings to different terms utilized therein. *See Lineberry v. Sec. Life & Trust Co.,* 238 N.C. 264, 77 S.E.2d 652, 654 (1953) ("An insurance contract must be construed without disregarding words or clauses used...."). Second, if the meaning of a policy term is "uncertain or capable of several reasonable interpretations, the doubts will be resolved

---

**11.** M/K's asserted delay in submitting the Builder's Claim was due to its determination—shared by Federal and held by M/K until Mr. Smith's assessment of the matter in August 1997—that the damages suffered by M/K and the Project resulted from design flaws in the Recycling Facility and thus were not Covered Losses. M/K's delay in submitting the Operations Claim was due to its lack of knowledge, until November 1998, of the Operations Policy, and the additional fact that it did not realize, until May 1999, that the losses in revenue suffered at the Recycling Facility were Covered Losses.

against" the insurer and in favor of the insured. *Register v. White,* 358 N.C. 691, 599 S.E.2d 549, 553 (2004) (internal quotation marks omitted). In applying these principles, we observe that the Policies utilize, *inter alia,* two separate and distinct terms to describe the procedures that an insured is obliged to follow to be entitled to indemnification: first, "notify [Federal] of the loss or damage," *see* Condition 3.b. (concerning giving of "notice"), and, second, "file with [Federal] sworn proof of loss" to assist in "settl[ing] the claim," *see* Condition 3.g. (concerning submission of "claim").[12] Significantly, neither of these two events, giving "notice" of loss or damage, on the one hand, or submitting a "claim," on the other, is defined in the Policies. In order to give effect to each of these policy terms, we are thus obliged to construe them as having different meanings. *See Lineberry,* 77 S.E.2d at 654. And we are mindful that, in construing undefined policy terms, we are to resolve any ambiguities against Federal. *See Register,* 599 S.E.2d at 553.

■ The word "claim," when used as a noun, has been defined as the "assertion of an existing right: any right to payment." *Black's Law Dictionary* 264 (8th ed.2004). *See also, e.g., Webster's Third New Int'l Dictionary* 414 (1976) (defining "claim" as "a demand for compensation, benefits, or payment (as . . . one made under an insurance policy upon the happening of the contingency against which it is issued)"). Other insurance policies that have defined the term "claim" have emphasized the term's connection to a demand for a remedy. *See Gaston Mem'l Hosp., Inc. v. Va. Ins. Reciprocal,* 80 F.Supp.2d 549, 554 (W.D.N.C.1999) (assessing term "claim," as defined in policy as "a demand," *inter alia,* for money); *Am. Cont'l Ins. Co. v. PHICO Ins. Co.,* 132 N.C.App. 430, 512 S.E.2d 490, 492 (1999) (assessing term "claim," as defined in policy as "an express demand for damages to which this insurance applies"). Accordingly, the ordinary meaning of the term "claim" suggests that a remedy is being sought by the entity submitting it.

■ The term "notice," on the other hand, in the context of providing notice of loss or damage, has been defined as "[l]egal notification required by law or agreement . . . ; definite legal cognizance, actual or constructive, of an existing right or title." *Black's Law Dictionary* 1090 (8th ed.2004); *see also, e.g., Webster's II New Riverside Univ. Dictionary* 805 (1988) (defining "notice" as "[a]n indication or warning of something"). In contrast to the term "claim," the ordinary meaning of the term "notice" fails to suggest that some remedy is being sought; instead it suggests that knowledge is being actually or constructively secured by the entity to which such notice is given. Indeed, under North Carolina law, a notification of loss has been recognized in situations in which an "insurer became aware" of loss or damage "through some means other than notice by the insured." *Great American II,* 340 S.E.2d at 746 n. 1;[13] *cf. Aetna Cas. &*

---

12. The term "claim" is used six times in the Conditions of the Policies. In each usage, the term is used in reference to the assertion of a right to payment, and it is never used in a manner synonymous with the term "notice."

13. In the *Great American* cases, the insurer received notice of the loss—an automobile accident involving its insured, a fuel truck driver— through its capacity as workers' compensation carrier for the employer of the driver. The court observed that a policy condition requiring an insured to notify its insurer of a loss "as soon as possible" exists to enable the insurer to conduct a timely investigation of an asserted loss or damage. It then concluded that the insurer had in fact received notice of loss, even though such notice was not given by its insured. *Great American II,* 340 S.E.2d at 746.

*Sur. Co. v.Dow Chem. Co.,* 10 F.Supp.2d 800, 813 (E.D.Mich.1998) (observing that untimely notice of loss cannot establish prejudice if insurer "received adequate and timely information" regarding loss) (internal quotation marks omitted); *Md. Cas. Co. v. Wausau Chem. Corp.,* 809 F.Supp. 680, 694 (1992) (concluding that insurer cannot establish prejudice if it was aware of potential claim at time of loss); *Merchs. Mut. Ins. Co. v. Anziano,* 59 Misc.2d 673, 300 N.Y.S.2d 187, 191 (N.Y.Sup.Ct.1969) (recognizing that "proof that . . . the insurer had notice of the [loss] tends to negate prejudice to the insurer" even if insured did not provide written notice of loss to insurer until later).

The foregoing discussion leads inexorably to the conclusion that, in the context of insurance coverage issues and their governing principles, the terms "claim" and "notice" of loss are not, as they are used in the Policies, the equivalent of one another. With this conclusion in mind, we turn to the district court's summary judgment awards.

## C.

### 1.

M/K first contends that the district court erred in awarding summary judgment to Federal on the Builder's Claim. The court resolved that Claim on the basis of the Prejudice Element of the *Great American* test. *See Great American I,* 279 S.E.2d at 776 (outlining six factors establishing prejudice). In its assessment of the Prejudice Element, the district court agreed with Federal that its ability to investigate the Claim was materially prejudiced by the fact that M/K had delayed its notice of loss. Opinion at 8. In evaluating whether Federal was materially

prejudiced, the court focused on the physical changes which had been made at the Energy Facility during the period of delay, observing that the damaged property was not available for examination when the Claim was submitted on September 11, 1997. *Id.* at 7, 279 S.E.2d 769. As the court noted, by June 1996, the damaged boilers at the Energy Facility had already been rebuilt and the Facility's damaged fuel-handling system had been repaired. *Id.*

In conducting its analysis, the district court cursorily examined the Notice Element of the *Great American* test, erroneously assuming that M/K's submission of the Builder's Claim in September 1997 constituted notice of loss under the Builder's Risk Policy. In so doing, it overlooked the fact that Federal was aware of the damages and extensive repairs at the Facilities as they occurred, and well before the Claim was filed. During his seven visits to the Facilities between May 1995 and November 1996, Mr. Martin of Federal discussed with representatives of both M/K and Federal the problems M/K was experiencing with the Energy Facility's boilers, its fuel-handling system, and its conveyor system. Federal contends, of course, that the visits made by Martin and other Federal representatives to the Facilities were for "underwriting reasons, not claims purposes." Martin's deposition testimony concerning his job duties (to assess the risks associated with the Project) and the frequency of his visits, however, show otherwise—*i.e.,* that Federal knew or should have known that the losses and damages suffered at the Facilities might be covered by the Policies and that M/K, as an insured, would be likely to submit a claim for Covered Losses.[14]

---

14. Whether the visits to the Facilities made by Federal's representatives served to give notice of the Project's losses and damages is an issue for a jury to decide. Viewing the evidence in

Indeed, M/K's October 8, 1996 report to BCH was provided to Federal that very month. That report spelled out with some specificity the damages suffered at the Facilities and the steps M/K was taking to remediate those damages, and it advised BCH and Federal of the status of those remedial steps.[15] Even though M/K did not submit its Builder's Claim until September 1997, it is hardly speculative to conclude that, with the knowledge acquired by way of Martin and his colleagues in 1995 and 1996, and with M/K's October 8, 1996 report, Federal should have perceived the potential for a claim being made by M/K under the Builder's Risk Policy. As a result, Federal could have conducted relevant investigative activity at the time the Facilities were being damaged and re-

paired. Put simply, Federal's failure to satisfy the Notice Element undermines the district court's summary judgment award on the Builder's Claim.[16]

2.

■ M/K also contests the district court's summary judgment award on the Operations Claim. The court decided that Claim on the basis of the Good Faith Element of the *Great American* test. *See Great American II,* 340 S.E.2d at 747 (assessing, under Good Faith Element, whether insured was aware that it possessed claim against insurer, and whether insured purposefully and knowingly failed to notify insurer of its claim). In its assessment of that element, the district court focused on two aspects of the dispute: (1)

---

the proper light, Federal's contention that the visits were not for claims purposes does not exculpate it from its obligations under the Policies.

15. The October 8, 1996 report, which Federal obtained on October 17, 1996, might well constitute the "smoking gun" evidence on the notice of loss issue. M/K described therein the following: (1) the conveyor system of the Energy Facility was experiencing high failure rates, resulting in M/K's replacing worn-out conveyor parts; (2) ash was building up in the boilers and in the conveyor system, resulting in their shutdown and in M/K's removal of aluminum from the waste being processed; (3) the demineralization system was deficient in providing the desired flow rate, due to inexperienced operators, use of the wrong chemicals, and incorrect testing of the water quality; and (4) the air compressors were not large enough to clean the air at the Energy Facility.

16. Assuming, however, that the Builder's Claim constituted the notice of loss mandated by the Builder's Risk Policy, the summary judgment award on that Claim would yet be flawed, for two reasons. First, the court failed to assess the evidence of Mr. Smith in the light most favorable to M/K. *See DeWitt v. Eveready Battery Co.,* 355 N.C. 672, 565 S.E.2d 140, 151 (2002) (holding expert testi-

mony to be sufficient to raise genuine issue of material fact). Instead, it credited the view of Federal's Regional Property Claim Supervisor, Mr. Nichols, that " 'there was no reason' [for Federal] to make a site visit in September 1997, when the Builder's Claim was submitted." Second, the court, relying primarily on *Charter Oak Fire Insurance Co. v. Carteret County Board,* 91 F.3d 129, 1996 WL 389480 (4th Cir. July 12, 1996) (unpublished table decision), focused its assessment on only one of the six factors under the Prejudice Element spelled out in *Great American I*—that physical changes had occurred in the location of the damages during the period prior to the Builder's Claim. It thus failed to consider properly the available evidence concerning the other five prejudice factors. In *Charter Oak,* an award of summary judgment to an insurer was upheld because the notice of loss was not given until more than five months after the damages occurred and after repairs to those damages had been completed. While it is an unpublished decision and thus not precedent, *see* Local Rule 36(c), *Charter Oak* is also readily distinguishable, because there was no evidence there of the "condition of the building at the time of the loss or immediately prior to the loss." 1996 WL 389480, at *3. In this proceeding, on the other hand, M/K presented substantial evidence on the condition of the Facilities at the time of the Covered Losses.

the six-month period between November 1998 and May 1999, and (2) M/K's failure to comply with the policy Conditions concerning the filing of a sworn proof of loss, as well as its initiation of legal proceedings against Federal. Opinion at 9–10.

As with the Builder's Claim, the court failed to consider, under the Notice Element, the fact that Federal knew of the damages and repairs at the Facilities while they were occurring. Federal thus fails to satisfy the Notice Element, and this fact renders unpersuasive the district court's use of this "delay" to support its conclusion, under the Good Faith Element, that M/K had failed to act in good faith. Mr. Martin's seven visits to the Facilities in 1995 and 1996, along with M/K's October 8, 1996 report, gave Federal every reason to perceive the potential for a claim being made.[17] In these circumstances, viewed in the proper light, Federal was provided with timely notice that a claim might be forthcoming for Covered Losses under the Operations Policy.[18] The evidence thus supports the proposition that M/K received timely notice with respect to the Operations Policy, and the summary judgment award on the Operations Claim must therefore be vacated.

**17.** As the insurer, Federal was familiar with the provisions of its insurance policies, and it thus should have perceived the potential for a claim being made under the Operations Policy.

**18.** Even assuming the Operations Claim submitted in May 1999 was Federal's initial notice of loss under the Operations Policy (which, viewed in the proper light, it was not), the district court's assessment of the Claim was erroneous for two reasons. First, the district court inappropriately made a finding of fact against M/K when it determined that, after M/K became aware that it was an additional insured under the Operations Policy in November 1998, it simply waited until May 1999, without good reason, to notify Federal of its loss. *See Fortress Re, Inc. v. Cent.*

## IV.

Pursuant to the foregoing, we vacate the awards of summary judgment to Federal on the Builder's Claim and on the Operations Claim, without prejudice to Federal's right to pursue alternative bases for relief, and we remand for such further proceedings as may be appropriate.

*VACATED AND REMANDED*

SHEDD, Circuit Judge, concurring:

I agree with Judge King that the summary judgment must be set aside. The *Great American* test is comprised of three parts: the notice element, the good faith element, and the material prejudice element. *See Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 303 N.C. 387, 279 S.E.2d 769 (1981) ("*Great American I*"); *Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 315 N.C. 714, 340 S.E.2d 743 (1986) ("*Great American II*"). Although Judge King primarily bases his decision on the notice element, I would vacate the summary judgment on alternate grounds identified briefly in notes 16 and 18 of Judge King's opinion: that is, the district court's erroneous conclusions that Federal is entitled to judgment as a matter of law on the Builder's Risk policy claim based on the material

*Nat'l Ins. Co.*, 766 F.2d 163, 166 (4th Cir. 1985) (observing that *Great American*'s "subjective standard for determining whether an insured acted in good faith makes it unlikely that the issue can be resolved by summary judgment"). Second, the district court, in ruling in favor of Federal, improperly relied on policy Conditions unrelated to the timely notice issue. *See, e.g., Am. Cont'l Ins. Co. v. PHICO Ins. Co.*, 132 N.C.App. 430, 512 S.E.2d 490 (1999) (assessing timely notice contention separately from contention that claim filed is not "claim" as defined by policy language); *Duke Univ. v. St. Paul Mercury Ins. Co.*, 95 N.C.App. 663, 384 S.E.2d 36 (1989) (assessing timely notice contention separately from statute of limitations contention).

prejudice element and on the Operations policy claim based on the good faith element.[1]

## I

Concerning the Builder's Risk policy claim, the district court concluded that "[e]ven assuming that M/K could demonstrate that it acted in good faith when it failed to report the damage to Federal at the time the damage occurred, . . . material prejudice to [Federal] arising from the two-year delay necessitates an award of summary judgment. . . ." J.A. 2659. The district court erred in reaching this conclusion.

Federal, as the insurer, bears the burden of proving material prejudice, *Great American I*, 279 S.E.2d at 776, and its burden at the summary judgment stage is to establish material prejudice as a matter of law, *see Fortress Re, Inc. v. Central Nat'l Ins. Co. of Omaha*, 766 F.2d 163, 166–67 (4th Cir.1985) (reversing summary judgment on *Great American* issue of material prejudice where genuine issues of material fact existed). Among the relevant factors to be considered in deciding the issue of material prejudice are: the availability of witnesses to the pertinent events; the ability to discover other information regarding the conditions of the locale where the events occurred; any physical changes in the location of the events during the period of the delay; the existence of official reports concerning the events; the preparation and preservation of demonstrative and illustrative evidence

(such as photographs); and the ability of experts to reconstruct the events. *Great American I*, 279 S.E.2d at 776. "Proof of the existence of any of the above factors is not determinative; the insurer must also show that the changed circumstance materially impairs its ability to investigate the claim or defend and, thus, to prepare a viable defense." *Id.*

The district court did not examine the evidence in the record in accordance with the foregoing standard. Instead, relying on our unpublished opinion in *Charter Oak Fire Insurance Company v. Carteret County Board of Commissioners*, 91 F.3d 129, 1996 WL 389480 (4th Cir.1996)[2]—the district court based its decision on one fact favorable to Federal:

> Federal did not have the opportunity to observe the damage or to observe the equipment in operation to assist in determining the cause of the damage because the damage was repaired by mid–1996 and the BCH project was "mothballed" later that year.
>
> . . .
>
> Here, as in *Charter Oak*, it is clear from the record that, regardless of the dispute about the cause of the damage at issue, the damage was indisputably repaired long before M/K notified Federal of the potential claim. The court must conclude, therefore, that the almost two-year delay between the occurrence of the damage at issue and the reporting of the claim to Federal in conjunction with the repair of the damage in the interim,

---

**1.** In *Great American II*, the Supreme Court of North Carolina stated with respect to the notice element: "In most instances, unless the insurer's allegations that notice was not timely are patently groundless, this first part of the test is met by the fact that the insurer has introduced the issue to the court." 340 S.E.2d at 747. The district court applied this principle in its analysis of both the Builder's

Risk and Operations policy claims. *See* J.A. 2658, 2662.

**2.** Regardless of the factual distinctions between this case and *Charter Oak*, that case is not binding precedent, and citation to it is disfavored. *See* Local Rule 36(c); *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir.1996) (en banc).

materially prejudiced defendant's ability to investigate the claim.

J.A. 2661.

In reaching its conclusion, the district court did not explain how Federal's "ability to investigate the claim or defend and, thus, to prepare a viable defense" was materially impaired. *Great American I*, 279 S.E.2d at 776. Moreover, the district court did not account for the evidence presented by M/K—including eyewitness, documentary, and photographic evidence—which creates a genuine issue of material fact as to material prejudice.[3] *See Fortress Re*, 766 F.2d at 166 (reversing summary judgment where issues of fact involve "questions of what [the insurer] would have done had it received timely notice and whether its intervention would have produced a more favorable result"). Accordingly, summary judgment on this claim cannot stand.

## II

As to the Operations Policy, the district court held: "Given the long, involved and complex history of this case, the court cannot conclude that M/K's filing of the claim against Federal under the operations policy in May 1999, over six months after learning of the policy's existence and approximately three years after the alleged business loss, was made in good faith." J.A. 2663–64. The district court also erred in reaching this conclusion.

---

3. *See ante* at 201 n. 16 ("M/K presented substantial evidence on the condition of the Facilities at the time of the Covered Losses").

4. I recognize that M/K, as the insured, ultimately bears the burden of establishing good faith. However, a fair reading of the record shows that Federal does not appear to have made this argument in its initial summary judgment motion or memorandum. *See* J.A. 82–84 (summary judgment memorandum,

The good faith element involves a two-part subjective inquiry: 1) was the insured aware of a possible claim, and 2) did the insured "purposefully and knowingly fail" to notify the insurer. *Great American II*, 340 S.E.2d at 747. This inquiry "is phrased in the conjunctive: both knowledge *and* the deliberate decision not to notify must be met for lack of good faith to be shown. If the insured can show that either does not apply, then the trial court must find that the insured acted in good faith." *Id.* (emphasis in original).

The district court acknowledged that the good faith inquiry is subjective. J.A. 2663. However, the district court neither identified the second part of the inquiry—*i.e.*, purposeful and knowing failure to give notice—nor explained how M/K's conduct can be deemed purposeful and knowing as a matter of law. Under these circumstances, the summary judgment on this claim must also be set aside.[4]

LUTTIG, Circuit Judge, dissenting:

I would affirm the grant of summary judgment on the reasoning of the district court.

The majority's conclusion that notice was provided to Federal while the damage was occurring is untenable. The majority appears not to dispute that notification only could occur when Federal had notice that losses had occurred and that those losses were at least potentially covered by the policy. *Ante* at 201 ("[I]t is hardly speculative to conclude that ... Federal

---

*Great American* and *Charter Oak* discussion focused on material prejudice). Instead, as the district court implicitly recognized in its summary judgment order, *see* J.A. 2663, Federal appears to have first raised this issue in its summary judgment *reply* memorandum. Consequently, the record appears to be devoid of evidence that directly bears on M/K's subjective intent. Under these circumstances, the summary judgment cannot stand.

should have perceived the potential for a claim being made by M/K under the Builder's Risk Policy."). That notification that a loss is arguably *covered* is required, rather than simply notification that an insured has suffered a loss, is confirmed by the command of the North Carolina courts that we construe timely notice requirements in accord with their purpose of "enabl[ing] the insurer to prepare a defense by preserving its ability to investigate an accident." *Great American Ins. Co. v. C.G. Tate Construction Co.*, 315 N.C. 714, 340 S.E.2d 743, 746 (1986) (*Great American II* ). If Federal did not receive notice that would persuade a reasonable insurer to investigate the loss, the notification requirement is thus unsatisfied.

M/K provides no evidence to support the conclusion that Federal had knowledge of damages *possibly covered under the Builder's Risk Policy.* Instead, M/K argues only that Federal had knowledge that M/K had suffered damages and was performing repairs. Given that M/K admits that it did not believe the problem was anything other than a design flaw until August 1997, no reasonable jury could possibly conclude that Federal's employees knew or should have known that M/K might ultimately file a claim for the damage under the policy, and the majority's contrary conclusion is simply unsupported by the record.[1] Not only were Federal's employees explicitly assured *by M/K's employees* that the damage was caused by a non-covered harm, Federal's employees did not even have responsibility for investigating insurance losses. *See* J.A. 2369, 2399–2400, 2416–19, 2426–27. Likewise, Federal cannot be said to have had notice of the covered loss or damage under the operations policy until M/K actually provided an indication that such a *covered* loss had occurred. The district court thus correctly concluded that notice was first provided of a possible covered loss under the Builder's Risk Policy no sooner than September 1997, and of a possible covered loss under the Operations Policy in May 1998.

With a proper recognition of the time at which notice was given, it is clear that Judge King and Judge Shedd err by rejecting the district court's conclusions that Federal was prejudiced in its investigation of the claim under the builder's risk policy and that M/K failed to act in good faith in giving notice under the operations policy.

Substantial changes, including the rebuilding of the boilers, repairs to the fuel handling system, and the apparent shutdown of the facility, had occurred before Federal was given *any* detail on the facts of the supposed "claim" under the builder's risk policy. J.A. 2693–94. Although North Carolina law requires that "the insurer must also show that the changed circumstance materially impairs its ability to investigate the claim or defend," the North Carolina Supreme Court has also noted that "[o]ften, proof of the changed circumstance itself will give rise to an inference of prejudice."[2] *Id.* Whatever Federal may have been able to piece together from fading memories and inoperable equipment, the complete shutdown of the

---

**1.** The majority's description of the October 8, 1996 letter as the "smoking gun" is unpersuasive. *Ante* at 201 n. 15. That letter was a response to a notice of default issued by BCH to M/K. It addressed problems highlighted by BCH, but gave no indication that Federal was at all involved in the dispute. J.A. 1818–26.

**2.** Although Judge Shedd gives great weight to the full list of factors the *Great American I* court lists as relevant to prejudice, *ante* at 203–04 (opinion of Shedd, J.), Federal's showing that circumstances have changed and that the change impairs its investigative ability is sufficient to affirm summary judgment notwithstanding the presence or absence of other factors. *See Great American Ins. Co. v. C.G. Tate Construction Co.*, 303 N.C. 387, 279 S.E.2d 769, 776 (1981) (*Great American I*).

facility undoubtedly is a sufficiently substantial "changed circumstance" to render an inference of prejudice appropriate.

M/K's attempts to demonstrate that available evidence would prevent prejudice do not suffice to overcome this inference. M/K first argues that the non-claims representatives, by their mere presence at the facility and conversations with M/K's employees, acquired sufficient information for a jury to conclude that the inability of claims representatives to investigate the damage was not prejudicial. However, M/K does not present evidence that these Federal employees performed any firsthand investigation of the boilers to make an independent determination of the cause of the damage. Accordingly, there are no grounds to believe that they acquired the knowledge necessary to make that determination now. M/K also argues that Federal could have examined the facility after it was no longer in operation, and consulted documents, records, photographs, and witnesses. But none of these sources would provide Federal with the opportunity to make the same firsthand investigation that the policy entitles it to make. Federal, thus, has clearly met its burden of proving that M/K's delay in notifying it of the damage was prejudicial.

As to the operations policy, the district court concluded that M/K did not act in good faith, because "in late 1998 [six months before a claim was made], M/K was aware of the operations policy, aware of the damage at the energy facility, aware of the suspension of operations at the recycling facility allegedly occasioned by that property damage, and aware of the lost revenue." J.A. 2696. Neither M/K nor the majority disputes this statement. M/K's only argument for reversal of summary judgment is that Federal did not prove that M/K actually knew that the claim was covered by the operations policy. However, M/K bears the burden of proof on this question, and, with respect to this burden, M/K neither proves that it lacked such knowledge nor even explains how it could possibly have lacked such knowledge. *See Great American I*, 279 S.E.2d at 776 ("[W]e also now impose the requirement that any period of delay beyond the limits of timeliness be shown *by the insured* to have been in good faith." (emphasis in original)). And it could not. After all, it had a copy of the policy and knew the cause of the damage. Given M/K's knowledge, I fail to see how one could describe M/K's failure to give notice of loss under the insurance for six more months as anything other than a "purposeful and knowing failure to give notice." *See ante* at 204 (opinion of Shedd, J.) (arguing that the district court did not sufficiently address whether M/K's failure to give notice was purposeful and knowing).

The district court's grant of summary judgment was thus compelled under North Carolina law as to both of the insurance policies at issue. I dissent from the majority's reversal of that judgment.